**C. Thomas WHITE and Adelyn S. White, Individually and d/b/a The White House, Inc., and Julianna M. White's Administrator, Appellants,**

v.

**WINCHESTER LAND DEVELOPMENT CORPORATION, the Winchester Bank, and The White House, Inc., Appellees.**

Court of Appeals of Kentucky.

June 8, 1979.

As Modified June 29, 1979.

Janet R. White, White, McCann & Stewart, Winchester, for appellant, Julianna M. White's Administrator.

John Paul Moore, Rick J. Thomas, Winchester, for C. Thomas White and Adelyn S. White, Individually and d/b/a The White House.

Henry L. Rosenthal, Jr., Winchester, for appellee, The Winchester Bank.

Edsel T. Jones, Winchester, for appellee, Winchester Land Development Corp.

Before MARTIN, C. J., and REYNOLDS and WINTERSHEIMER, JJ.

MARTIN, Chief Judge.

Charles T. and Adelyn S. White appeal from a decision of the circuit court holding that certain stock pledged as security on appellants' personal loan could be sold by the appellee bank to discharge the indebtedness on subsequent loans executed by appellants in the name of their corporation. The rather unusual facts of this appeal present several significant questions as to the extent of individual liability on corporate loans.

On February 2, 1973, Charles T. and Adelyn White jointly executed a $15,000.00 personal note to The Winchester Bank. To secure this note, Charles' mother, Julianna M. White, executed a pledge agreement[1]

---

1. We distinguish an hypothecation from a pledge. In the true hypothecation situation, there is no transfer of possession by delivery. In the typical pledge situation, which we have

and delivered 670 shares of Allied Stores Corporation common stock to the bank. The loan ledger of The Winchester Bank, filed as an exhibit, shows that the note on February 2 increased the indebtedness of the borrower, Charles T. White, to $22,932.00. This indebtedness was gradually reduced, and after an increase on April 11, the loan ledger indicated a balance of zero by June 8.

Appellants incorporated their card and gift shop as The White House, Inc. on May 23. On June 6, Charles T. White signed a note in the amount of $20,000.00 to The Winchester Bank in his capacity as president of the corporation. On July 1, 1974, Adelyn White, the Secretary-Treasurer of The White House, Inc., signed a third note. This note was signed on behalf of the corporation in the amount of $19,630.36. Based upon requests for admissions filed in the trial court, these two notes, less payments, represented the indebtedness of The White House, Inc. to The Winchester Bank in the amount of $18,350.02 prior to this law suit. In 1975, The White House, Inc. became insolvent.

The crucial problem in this case centers upon whether the 670 shares of stock pledged by Julianna White on the appellants' personal note may be considered continuing security for the notes made in the name of The White House, Inc. Those shares of stock were originally issued by the Allied Stores Corp. to Charles R. White and Julianna White as joint tenants with the right of survivorship. Charles R. White died on November 26, 1972, and Julianna M. White died on October 10, 1974. Thus, a claim is now being made by the bank for the stock certificate upon the grounds that the stock is security for the corporate loans. Julianna's surviving heirs, on the other hand, contend that the stock was released as security upon the appellants' payment of the indebtedness on the original loan.

The trial court held that the second and third notes were mere renewals of the original notes, denying the Whites' motion for summary judgment on the issue and ordering them to pay the bank the amount of $15,000.00, "the amount of the original loan to the individuals which the pledge secured." [2] The trial court thus granted summary judgment in favor of the appellees.

We are of the opinion that the decision below is erroneous. In reaching that result, we must consider the following questions.

1. Did the appellants sign the second and third notes in an individual or corporate capacity?

2. If the notes were signed in a corporate capacity, should the appellants nevertheless be held personally liable on the notes on the theory that the principal, The White House, Inc., was a mere sham?

3. If The White House, Inc. was not a sham corporation, were there sufficient indicia of intent to evidence a novation by the bank such that the earlier pledge was released? Alternatively, did the loan by the bank to The White House, Inc. constitute a mere renewal so that the earlier pledge remained in effect.

I.

In addressing the first issue, we note at the outset that Charles T. White, the maker of the second note, and Adelyn White, the maker of the third one, signed those notes as follows:

The White House, Inc. by: Charles T. White, Pres. and
The White House, Inc. by: Adelyn S. White, Sec/Tres.

KRS 355.3-403(3), in effect since July 1, 1960, provides that "[e]xcept as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity." [3]

---

in the instant case, possession of the security is actually transferred by delivery to the party to be secured.

2. However, the trial court upheld the Whites' motion for summary judgment as to any amounts over and above the first $15,000.00,

stating that "the bank will have to bear the burden of poor judgment beyond that point."

3. Although the legislature has not adopted the Official Comments to the Uniform Commercial Code (KRS ch. 355), these Comments "are by far the most useful aids to interpretation and construction of the code." *See* White and

The significance of the fact that the Whites' signatures were made in a representative capacity is that after the identity of the principal (here, The White House, Inc.) is disclosed, the agent is not liable for his own *authorized* acts. This fundamental tenet of the law of agency was upheld in *Potter v. Cheney*, Ky., 290 S.W.2d 44 (1956), and was recently followed in *American Collectors Exchange v. Auter, Smalley, and Stengle, Inc.*, Ky.App., 566 S.W.2d 759 (1978). The record shows that on May 31, 1973, The White House, Inc. adopted a resolution to the effect that the President and Secretary-Treasurer of the Corporation were authorized to effect loans at any time for this corporation from The Winchester Bank, ". . . and to sign any notes . . . of this corporation." Further, that resolution states that a certified copy thereof was delivered to the bank. Hence, the bank had notice of the agency relationship and the resolution which authorized the Whites, in their official capacities, to make notes. To this extent the principal, The White House, Inc., was liable on the notes and the agents, the Whites, were not.

▮ As we noted, however, merely finding that appellants signed these later notes in a corporate rather than an individual capacity does not dispose of this appeal. If The White House, Inc. is a "sham" corporation, as contended by appellees, the corporation could be held simply an "alter ego" of appellants.[4] Under that theory, appellants could be held liable on the later notes regardless of the fact that they signed them in a corporate capacity.

II.

The second issue presented on this appeal deals with appellees' contention that The White House, Inc. is a mere sham designed to defraud its creditors. Thus, it is argued, the corporate veil should be pierced and the Whites found to be personally liable for the obligations of the corporation upon the basis that the corporation is an "alter ego" of the Whites. Appellees regard *Zanone v. Standard Oil Co.*, Ky., 322 S.W.2d 710 (1959), as controlling.

▮ In the *Zanone* case, it was established that the corporation was a family device organized to take over the business of a partnership without any cessation of activity. Many of the assets of the partnership were transferred to the corporation without consideration. According to one of the partners who became the president of the corporation, the sole purpose of the incorporation was " 'to search about for some means to be able to do business and not be entangled with the past.' " The

---

Summers, *Handbook of the Law under the Uniform Commercial Code* 11 (1972). Thus we note that Comment 3 to U.C.C. 3–403 provides that:

> 3. *Assuming that Peter Pringle is a principal and Arthur Adams is his agent, an instrument might, for example, bear the following signatures affixed by the agent—(a) "Peter Pringle," or (b) "Arthur Adams," or (c) "Peter Pringle by Arthur Adams, Agent," or (d) "Arthur Adams, Agent," or (e) "Peter Pringle Arthur Adams."*
>
> A signature in form (a) does not bind Adams if authorized (Sections 3–401 and 3–404).
>
> A signature as in (b) personally obligates the agent and parole evidence is inadmissible under subsection (2)(a) to disestablish his obligation.
>
> The unambiguous way to make the representation clear is to sign as in (c). . . .

4. The interrelationship of "alter ego" and novation is, as to this case, somewhat subtle. As will be seen *infra*, a novation (a method by

which a later contract involving the obligee vitiates an earlier one) may take place whether or not new parties are substituted. *Watts v. Smith*, 250 Ky. 617, 63 S.W.2d 796 (1933). We cannot doubt, however, that evidence of a "new" obligation wherein the identity of the parties thereto remained unchanged would have to be very clear indeed. *Cf. Kirby v. Scroggins*, Ky., 246 S.W.2d 453 (1952), and *National Bank of Lima v. Deaton*, 279 Ky. 606, 131 S.W.2d 495 (1939). Applying this theory to the instant case, the possibility that a novation in fact occurred is slight.

Similarly, the two concepts are related in that a sham incorporation would be indicative of bad faith, which inquiry is always pertinent to the propriety of a novation. *See* White and Summers, *supra* footnote 4, at pp. 40–41. Finally, the issue of a sham incorporation is also material as regards the concepts of fairness and equity, which were the sole grounds upon which the trial court based its opinion.

holding, then, was based upon direct and uncontroverted evidence that the corporation was merely a fraudulent device which operated to do indirectly what the partnership could not do directly, viz, to defraud its creditors.[5] To the extent that the record in this case is utterly devoid of such evidence, we find the *Zanone* case to be clearly distinguishable on its facts from the instant case, and hence not controlling. However, despite the fact that a corporation is usually recognized as an entity which is distinct from its shareholders, officers, and directors, there are "specific, unusual circumstances" that will prevent the rule of limited liability from applying. *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967).

Three basic "theories" have been utilized to hold the shareholders of a corporation responsible for corporate liabilities. *See* Campbell, *Limited Liability for Corporate Shareholders: Myth or Matter-of-Fact*, 63 Ky.L.J. 23, 33 (1975). These have been labeled (1) the instrumentality theory; (2) the alter ego theory; and (3) the equity formulation. Because the bank seeks to rely upon all of these theories—if indeed they are distinct—they bear some examination.[6]

■ Under the instrumentality theory three elements must be established in order to warrant a piercing of the corporate veil: (1) that the corporation was a mere instrumentality of the shareholder; (2) that the shareholder exercised control over the corporation in such a way as to defraud or to harm the plaintiff; and (3) that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss. The courts adopting this test have been virtually unanimous in requiring that these three ele-

ments co-exist before the corporate veil will be pierced. *See Campbell, supra* at 33.

■ In this case it cannot be doubted that the Whites exercised a great deal of control over the corporation insofar as they were the sole shareholders. However, mere ownership and control of a corporation by the persons sought to be held liable is not alone a sufficient basis for denial of entity treatment. *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976). As to the second element, our courts have placed a great emphasis upon fraudulent organization and have denied entity treatment upon that basis. *See Poyner, supra* at 958, and the authorities cited therein. The record before us is utterly devoid of the essential elements of fraud, *i. e.*, material representation, falsity, scienter, reliance, deception, and injury. *See Sanford Construction Co. v. S & H Contractors, Inc.*, Ky., 443 S.W.2d 227 (1969), and *Scott v. Farmers State Bank*, Ky., 410 S.W.2d 717, 720 (1967). A discussion of the third element, that is, a refusal to disregard the corporate entity which would subject the plaintiff to unjust loss, shall be pursued in the next section of the opinion which deals with the problems of renewal and novation; suffice it to say here that the bank's loss was not unjust because it could have secured the loan to The White House, Inc., merely by requiring the Whites to sign those notes in their individual and separate capacities.

■ As regards the alter ego formulation, the elements thereof have been defined as follows: (1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and (2) that the facts are such that

---

5. This has been referred to as the "but—for" test, *i. e.*, that, having indirectly achieved the result of having deprived a plaintiff of a remedy he would have had but for the existence of the corporation, the defendant has accomplished what he could not accomplish directly. *See Thermothrift Industries, Inc. v. Mono-Therm Insulations Systems, Inc.*, 450 F.Supp. 398, 405 (W.D.Ky.1978).

6. It is noteworthy that the cases that apply these tests show that the courts have been

more willing to "pierce the corporate veil" when the defendant is a corporation that owns some subsidiary, rather than an individual, controlling shareholder. Hamilton, *The Corporate Entity*, 49 Tex.L.Rev. 979 (1971), *cited in Campbell, supra*, at note 49. *Cf. Louisville and N. R. Co. v. Carter*, 226 Ky. 561, 10 S.W.2d 1064 (1927). *But see Dare to Be Great, Inc. v. Commonwealth*, Ky., 511 S.W.2d 224 (1974), and *Big Four Mills Ltd. v. Commercial Credit Co.*, 307 Ky. 612, 211 S.W.2d 831 (1948).

an adherence to the normal attributes, *viz*, treatment as a separate entity, of separate corporate existence would sanction a fraud or promote injustice. *G. E. J. Corporation v. Uranium Air, Inc.*, 311 F.2d 749, 756 (9th Cir. 1963), *cited in Campbell, supra* at n.60. Again, there was no evidence of fraud adduced, and whatever loss the bank has suffered or may suffer could have been mitigated entirely by securing itself to the extent that the law allows. As to any allegations of failure to adhere to necessary corporate formalities, we again find the resolution, mentioned *supra* at page five, instructive. The fact that such a resolution was made and passed evidences that, by observing such a formality, the Whites complied with the strictures of proper corporate existence and thus maintained the separateness of entity so vital to the legitimate corporate function.[7]

■ While these two formulations are helpful as an analytical framework, issues of "alter ego" do not lend themselves to strict rules and prima facie cases: whether the corporate veil should be pierced depends upon the innumerable equities of each case. *Cf. United States v. Standard Beauty Supplies Stores, Inc.*, 561 F.2d 744 (9th Cir. 1977). Because this issue depends not only upon close-connectedness (which is inevitable in all closely held businesses) but also upon such actions as would indicate unfair dealings, an examination of those other factors is mandated. *Von Brimer v. Whirlpool Corp., Inc.*, 362 F.Supp. 1182 (N.D.Cal.1973). Indeed, a number of factors are considered in all the cases no matter what "test" is being applied. *Dewitt Truck Brokers, Inc. v. W. Ray Fleming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976); *Dudley v. Smith*, 504 F.2d 979 (5th Cir. 1975); *Lakota Girl Scout Council, Inc. v. Havey Fund Raising Management, Inc.*, 519 F.2d 634 (8th Cir. 1975);

and *Amoco Chemical Corp. v. Bach*, 222 Kan. 589, 567 P.2d 1337 (1977).

■ Generally speaking, the corporate veil should only be pierced "reluctantly and cautiously"[8] and then only in the presence of a combination of the following factors: (1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities. 1 *Fletcher's Cyclopedia of Private Corporations* § 41. Because all the factors save undercapitalization are part and parcel of each other, we may dispense with them first.

There is simply no evidence in this case supporting a finding that factors (2) through (5) are true. In fact, there are some elements of this appeal which could be construed as negating those factors. For example, both Exhibit E mentioned *supra* and the form in which the Whites signed the notes indicate that (2) and (5) as set out above are not applicable herein.

■ The theory of undercapitalization, while somewhat more problematic, is not significant here because Kentucky law does *not require any minimum paid-in capital* before a corporation begins to do business. *See* Note, *Organizing the Corporation under the New Business Corporation Act, a Comparison with Prior Law*, 61 Ky.L.J. 95, 106 (1972). More significant are the policy reasons behind the prohibition of undercapitalization—to protect innocent third parties who had no way of knowing that they were dealing with an impecunious entity. An example of this is the case of *Mull v. Colt Co.*, 178 F.Supp. 720 (S.D.N.Y., 1959), in

---

**7.** *Cf.* KRS 271A.280 (except as against the state or for an involuntary dissolution of a corporation, neither of which is present here, the mere issuance of the certificate of incorporation is conclusive evidence that a corporation has been properly incorporated under Chap. 271A).

**8.** *See* N. Butler, *Why Should We Change Our Form of Government* 82 (1912):

I weigh my words when I say that in my judgment the limited liability corporation is the greatest single discovery of modern times . . . . Even steam and electricity are far less important than the limited liability corporation, and they would be reduced to comparative unimportance without it.

which the court noted that a refusal to allow plaintiff (who was injured by defendant's taxicab) to recover would be unjust because the defendant had his taxicabs and licenses as assets, even though the corporation was without value. In the instant case, the bank cannot be heard to complain that The White House, Inc. was undercapitalized because the bank had knowledge of the financial status of the corporation and could have protected itself.

### III.

▮ Having concluded that the corporate veil should not have been pierced in this case leads us to the third and final issue of whether the second and third loans constituted a novation or a renewal of the original note. Although the trial court found that "the renewal notes did not constitute a novation so as to release the original debtors," we believe that there are genuine issues of fact as to this question.

▮ Kentucky law is well-settled that a renewal note will not extinguish an obligation. *Cantrill Construction Co. v. Carter*, 418 F.2d 705 (6th Cir. 1969), *citing Porter v. Bedell*, 273 Ky. 296, 116 S.W.2d 641 (1938). A renewal note is thus distinguished from a novation which does operate to extinguish an original debt. Whether a second note is a renewal of the original obligation, or a novation thereof, depends upon the intentions of the parties. 11 Am. Jur.2d *Bills & Notes*, §§ 307, 914. The question of intention in such cases often turns, to a large extent, on the terms of the hypothecation or pledge agreement. *See Amlung v. First National Bank*, Ky., 411 S.W.2d 465, 467 (1969), and *Georgi v. First National Bank*, Ky.App., 557 S.W.2d 442 (1977). However, unlike the *Amlung* and *Georgi* cases, the pledge agreement involved in this case does not clearly answer the renewal question.

Both *Amlung* and *Georgi* involved hypothecation agreements which clearly authorized the borrowing of additional funds by the same parties who actually executed the second loans. The *Amlung* and *Georgi* cases held that such authorization made the second loans mere renewal notes of the first obligation. In the case at bar, however, the pledge agreement executed by Julianna White authorizes loans to her son. The corporation is not mentioned in the agreement.[9] Moreover, unlike most security agreements, the pledged stock was transferred and delivered to the borrower, appellant herein, rather than to the bank. Thus, the question of intention in this case is not nearly as clear as it was in *Amlung* and *Georgi*

Appellees argue, however, that the case was proper for summary judgment because Julianna White lived with appellants. Thus, it is argued, Julianna had actual knowledge that the Allied Corporation stock had been pledged for the corporate debt.[10] However, the evidence as to actual

---

9. The agreement executed by Julianna M. White on February 2, 1973, provides, in pertinent part, as follows:

. . . I hereby certify that the above described securities have been duly transferred and delivered by me *to said borrower*, and hereby expressly authorize said borrower to pledge or hypothecate all or any part of said security for the indebtedness aforesaid and all extension and renewals thereof; and also for *any and all* other indebtedness of the same debtor to you, created at any time before this authorization shall have been revoked in writing, . . . I agree that all or any property pledged or hypothecated as aforesaid, shall be subject in your hands or those of your assignees, or pledges or pledgee, to all powers which would apply thereto by contract or otherwise if said property in fact so pledged or hypothecated *stood in the name of said borrower himself and not in my name.* The proceeds of all loans shall be accounted for and paid over to the borrower aforesaid, and said collateral securities or any surplus therefor may be accounted for and paid over, on full satisfaction of your claims to said borrower. (Emphasis added).

10. Whether such actual knowledge would be relevant depends upon whether Julianna White's heirs and devisees assert that the contract between Julianna White and the bank was unconscionable because, by delivering the stock to her nephew and not to the bank, the bank is not automatically precluded from applying the earlier pledge to the later debt of another debtor in a different, and innocently assumed capacity.

knowledge is also conflicting. Neither are we persuaded that the notations on the back of the later loans which showed the stock as pledged amount to conclusive proof of actual knowledge.

Given the unanswered questions as to the parties' intentions and the conflicting evidence in the record, we are of the opinion that the summary judgment in this case was improper. *See Kirk v. United Fuel Gas Co.*, Ky., 450 S.W.2d 504 (1970), and CR 56.03.

 The rule is that property which is pledged as collateral for a certain debtor may not be applied as security for the debt of the original debtor in a different capacity. *Atherton Co. v. Ives*, 20 F. 894 (6th Cir. 1884). However, we are also aware that it is not the function of this Court to change obligations of a contract which the parties have made, *O. P. Link Handel Co. v. Wright*, Ky., 429 S.W.2d 842 (1968), nor to add a condition which was not written into the contract. *Consolidated Jewelers, Inc. v. Standard Financial Corp.*, 325 F.2d 31 (6th Cir. 1963). Without more evidence, there exists simply too many unanswered questions to allow us to uphold a summary judgment.

For the above reasons, we find that the trial court's entry of summary judgment was in error. In its determination of this case, the trial court should take the following factors into consideration and ascertain whether there is sufficient evidence to make findings on any of them: (1) whether Charles T. White did in fact consider the pledge valid on the substitute notes; (2) whether Charles T. White or Adelyn S. White were aware of the notations on the backs of the second and third loans (which notations evidence that the stock had been pledged for these obligations); (3) whether the fact that Mrs. Julianna M. White's having lived with Charles T. and Adelyn S. White shows that the relationship was close and beyond that of an ordinary surety; and (4) whether the bank did in fact intend not only to substitute the new agreements for the old agreement, but also to extinguish the older ones.

The judgment of the Clark Circuit Court is reversed.

All concur.