886 F.2d 330
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James D. FRANCIS, II, and Nancy L. Francis, Plaintiffs-Appellants,
v.
MIDDLE STATES COAL COMPANY, INC., Gunlock Minerals, Inc., M
& F Coal Company, Johnson-Greene Company, and
Richard D. Johnson, Defendants-Appellees.
 No. 88-5472.
 United States Court of Appeals, Sixth Circuit.
 Sept. 29, 1989.
 
 Before RALPH B. GUY, Jr., BOGGS and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs James and Nancy Francis (Francis) appeal from summary judgments and jury verdicts in favor of defendants Middle States Coal Company, Inc., Gunlock Minerals, Inc., M & F Coal Company, Johnson-Greene Company, and Richard D. Johnson (referred to collectively as MSCC). Plaintiffs alleged that certain of these defendants had (1) intentionally circumvented a minimum production covenant in a coal sublease to which plaintiff was sublessor, (2) abandoned coal properties covered by this sublease, (3) violated a coal land non-acquisition agreement in this sublease, (4) tortiously interfered with certain defendants' performance of covenants under this sublease, and (5) defrauded plaintiffs by altering maps provided to plaintiffs of mines on and near the subleased property.
 
 
 2
 The district court granted summary judgment to defendants on the circumvention and abandonment claims. The remaining three claims went to a jury, which returned a verdict in favor of the defendants as to all three claims. Plaintiffs appealed. We affirm the decision of the district court as to all claims.
 
 
 3
 * On May 9, 1975, Richard D. Johnson (Johnson) purchased 51% of Middle States Coal Company stock. Johnson-Green Company (J-G), a Michigan corporation wholly owned by Johnson, purchased the remaining 49% of MSCC stock. Johnson was made president and director of MSCC. On the same day, MSCC entered into a sublease with Francis, a New York resident, for the Francis coal reserves (Reserves) in Magoffin County, Kentucky.[1] Johnson signed the sublease in his official capacity as president of MSCC, not in his individual capacity.
 
 
 4
 This sublease, which allowed MSCC to mine coal on the Reserves, had a number of restrictions. First, MSCC had to mine a minimum amount of coal each month. Second, MSCC could not lease or attempt to lease coal lands within ten miles of the Reserves (the Restricted Area). Third, MSCC had to notify Francis of any available coal lands within the Restricted Area and assist him in obtaining them.
 
 
 5
 On May 8, 1978, MSCC hired William Hoppman to, inter alia, "search and arrange for additional mineral leases and surface leases as required." On August 15, 1979, Francis consented to an assignment of the sublease by MSCC to Citizens Fidelity Bank and Trust Company (Citizens) as collateral for a loan to MSCC.
 
 
 6
 Hoppman made preliminary inquiries which led to the signing of a lease for the properties of Oron Salyer (Salyer) on May 8, 1980, on behalf of M & F Coal Company (M & F). These properties were within the Restricted Area. Johnson wholly owns M & F, a Kentucky partnership that consists of Johnson and his wholly-owned J-G Co.
 
 
 7
 In 1982, Johnson learned that Matewan Minerals, Inc. (Matewan) was willing to lease some land in the Restricted Area. Johnson negotiated a coal sublease on April 6, 1982 and a coal lease on August 18, 1982. Hoppman signed the lease on behalf of Gunlock Minerals Corporation (GMC). Johnson owns 60% of GMC and the remainder is owned by his two sons. Johnson installed Hoppman as president and director of GMC, but Hoppman continued to receive all of his salary from MSCC. Francis alleges that he did not know of the lease of the Salyer and Matewan properties or of the existence of M & F and GMC during this time.
 
 
 8
 Between 1980 and 1984, Francis informed MSCC numerous times that it was breaching the minimum production covenant: June 2, 1980; October 31, 1981; November 9, 1981; May 23, 1983; July 11, 1984; and August 17, 1984. Francis spoke many times with Johnson or his son concerning MSCC's breach of the minimum production covenant. MSCC contends that Francis had threatened to terminate the sublease a number of times, but had never demanded or requested payment, royalties or damages for failure to meet the minimum production requirement.
 
 
 9
 On November 20, 1984, Francis gave MSCC a default notice for breach of the minimum production covenant. MSCC left the property by January 18, 1985. On January 22, 1985, MSCC notified Francis that it was complying with the termination of the sublease.
 
 
 10
 On July 9, 1985, Francis filed suit against MSCC, GMC, Johnson, Johnson's son, and Hoppman, and later joined, among other defendants, M & F and J-G Co.
 
 
 11
 On January 22, 1987, the magistrate entered his Report and Recommendation which recommended granting MSCC's motion for summary judgment on the issues of whether termination of the sublease was the sole remedy under the minimum production covenant and whether notice of default and failure to cure were, absent more, sufficient to terminate the sublease. Francis objected to this report on January 30, 1987. The court granted summary judgment to MSCC on these issues on April 1, 1987.
 
 
 12
 The case went to trial on March 21, 1988. At the end of the presentation of the evidence on March 24, Johnson's son and Hoppman, along with another defendant, were dismissed. All the remaining counts of the complaint were submitted to the jury. The jury found in favor of MSCC on all the remaining counts of Francis's complaint: the claim that MSCC had violated the coal land non-acquisition covenant, the tortious interference claim, and the fraud claim. Francis filed a motion for a new trial, which was denied. Francis appealed the grant of summary judgment and the denial of his motion for new trial. We affirm as to all counts.
 
 II
 
 13
 Francis contends that MSCC intentionally mined less coal than was possible from the Reserves (and thus avoided paying royalties to Francis) and supplemented this production with coal mined on the Salyer and Matewan properties (which were in the Restricted Area but not subject to royalties) purchased from M & F.
 
 
 14
 He argues that MSCC should be liable in damages for the royalties up to the minimum tonnage.
 
 
 15
 MSCC contends that Francis can neither demand royalties on the minimum tonnage nor collect money damages for its breach. Paragraph 6 of the sublease, entitled "Minimum Production Requirements," provides in relevant part that:
 
 
 16
 If in any two successive calendar months [MSCC] should fail to mine and remove by any and all mining methods at least 75% of the production requirements set forth in this paragraph ... then in such event [Francis] shall have the right to terminate this sublease and re-enter and repossess the same as their former estate, and all rights of [MSCC] under this instrument shall cease and terminate which right [Francis] shall have, notwithstanding payment by [MSCC] of the minimum royalties set forth in Paragraph 3 hereof; provided, however, if [MSCC] in its discretion chooses to pay the royalty that would be due on the minimum tonnage requirements for any particular month, then [Francis] shall not have the right to terminate this lease on the basis of the failure of the [MSCC] to meet the minimum production requirements for that month.
 
 
 17
 MSCC contends that breach of this minimum production covenant may be remedied only by termination; royalties for the minimum tonnage cannot be recovered.
 
 
 18
 On January 22, 1987, the magistrate found Paragraph 6 unambiguous in that termination of the sublease was the sole remedy for MSCC's breach of the minimum production covenant. Thus, termination was the only remedy available to Francis. Walters v. Akers, 101 S.W. 1179 (1907); Wisdom v. Nichols & Shepherd Co., 97 S.W. 18 (1906). Francis filed timely objections. The objections were denied and the magistrate's Report and Recommendation on this issue was confirmed by the district court.
 
 
 19
 * MSCC argues that Paragraph 6 of the sublease makes performance of the minimum production covenant discretionary; that is, MSCC can refuse to mine and let Francis terminate the sublease. MSCC argues that if breach of the minimum production covenant requires the payment of royalties (or damages) on the minimum tonnage, then the minimum royalties provision is meaningless. Paragraph 3 of the sublease provides for the payment of minimum royalties:
 
 
 20
 In each calendar month throughout the term of this Sublease, [MSCC] covenants and agrees to pay to [Francis] the following sums as minimum monthly royalty.... [MSCC] may in any succeeding calendar month recoup such payments made in excess of tonnage royalties due but only after [MSCC] shall have first mined and removed by any and all methods the minimum tonnage requirements applicable to that month under the terms of paragraph 6.
 
 The Paragraph further provides that:
 
 21
 Payment of such minimum royalties shall not, however, affect the independent obligation and covenant of [MSCC] concerning minimum production, as set forth in paragraph 6 hereof.
 
 
 22
 Paragraph 6 permits Francis to terminate the sublease for failure to mine the minimum amount of coal, "notwithstanding payment by [MSCC] of the minimum royalties set forth in paragraph 3." MSCC points out that if the minimum production covenant in Paragraph 6 imposes a duty to pay royalties on the minimum production, then the minimum royalties provision in Paragraph 3 is meaningless. Minimum royalties would then be the royalties due under the minimum production covenant in Paragraph 6 and not those stated as minimum royalties in Paragraph 3. We agree with MSCC's contention.
 
 B
 
 23
 Francis contends that the general default provision in the sublease allows the election of common law remedies for the breach of any provision of the contract, including the minimum production covenant. Paragraph 14 of the sublease, entitled "Defaults," provides in relevant part that:
 
 
 24
 [a]ny failure of [Francis] to exercise the rights herein granted with respect to any particular matter of default shall not constitute a waiver of their right at any subsequent time to cancel or terminate this sublease or to seek any other remedy with respect to that or any other default hereunder.
 
 
 25
 Francis insists that the phrase "or to seek any other remedy with respect to that or any other default hereunder" must be read to allow remedies other than termination of the sublease; he submits that one of the remedies at common law for breach of a minimum production covenant is damages. North Star Co. v. Howard, 341 S.W.2d 251, 254 (Ky.1960). Francis asserts that his right to terminate for breach of the covenant should not prevent him from collecting damages as well.
 
 
 26
 The district court states, and we agree, that damages are only appropriate for breach of a minimum production covenant when no specific remedies are stated. If remedies for breach are stated in a contract, those remedies are exclusive. Walters v. Akers, 101 S.W. 1179 (1907); Wisdom v. Nichols & Shepherd Co., 97 S.W. 18 (1906). Indeed, the leases in the cases cited by Francis to rebut this proposition impose no specific remedies for breach of a minimum production covenant. See Coal Resources, Inc. v. Gulf & Western Industries Inc., 756 F.2d 443 (6th Cir.1985); North Star Co. v. Howard, 341 S.W.2d 251 (Ky.1960). We therefore affirm the district court's grant of summary judgment to MSCC.
 
 III
 
 27
 On November 20, 1984, Francis issued a notice of default to MSCC for repeated breaches of the minimum production covenant. Paragraph 14 of the sublease provides in relevant part:
 
 
 28
 In the event [MSCC] should fail to keep and perform all of the terms, covenants, conditions, stipulations, and agreements of the base lease or of this sublease or should fail to pay the royalties when and as the same becomes due and payable, and such failure should continue for a period of ten (10) days after the mailing of written notice thereof by [Francis] to [MSCC] then, in any of such events, [Francis] may cancel and terminate this sublease and repossess the premises as of their former estate, and all rights of [MSCC] in respect thereto shall cease and any improvements placed on the subleased premises by [MSCC] shall become the property of [Francis].
 
 
 29
 The notice of default stated, in part, that MSCC had ten days to cure the default by paying the royalties due on the minimum tonnage and that if it did not do so, "sublessors will terminate the sublease and repossess the premises and all of your rights as sublessee shall cease and all improvements placed on the subleased premises by you as sublessee shall become property of sublessors." MSCC asked Francis to reconsider his position.
 
 
 30
 On December 11, 1984, Francis wrote MSCC stating that under the terms of the assignment of the sublease by MSCC to Citizens, Citizens had 50 days from the date of notice to cure the default. On December 17, 1984, MSCC relayed the notice of default to Citizens and informed them of their fifty-day period to cure. Again, MSCC asked Francis to reconsider his position. On January 22, 1985, MSCC sent Francis a letter notifying Francis that MSCC had terminated its mining operations on or before January 18, 1985.
 
 
 31
 Francis contended that termination of the sublease required an additional act beyond sending a notice. Francis claimed that MSCC abandoned the premises and that he was damaged by this alleged abandonment. He argued that the letters of November 20, 1984 and following manifested only an intention to terminate the sublease in January 1985, but did not themselves effectuate termination.
 
 
 32
 MSCC contended, however, that the letter was both a notice of default and a notice of termination, effective upon the expiration of the specified grace period. Thus, after the expiration of the grace period, MSCC had to leave the property or be liable for trespass damages.
 
 
 33
 MSCC moved for summary judgment on this issue. The magistrate, in his Report and Recommendation of August 18, 1986, found a clear intent on the part of Francis to terminate the sublease upon expiration of the grace period. The sublease itself only required a notice of default and failure to cure to terminate the lease. Francis objected to this report. The district court denied the objection, and entered summary judgment for MSCC on April 1, 1987.
 
 
 34
 Francis raises two issues on appeal. First, he contends that his intent should govern the interpretation of the letter; since he did not intend to terminate the sublease by the letter, there is a genuine issue of material fact. Second, Francis contends that, as a matter of law, notice of default does not terminate the sublease absent some additional affirmative step.
 
 
 35
 * Francis states that, under Kentucky law, the question of whether a lease has been terminated or abandoned is a question of intent, citing Browning v. Cavanaugh, 300 S.W.2d 580 (Ky.1957); Lebow v. Cameron, 394 S.W.2d 773 (Ky.1965); and Browning v. Mountain States Coal Corp., 338 S.W.2d 220 (Ky.1960). Francis contends that he intended to give notice of the breach, and did not intend to terminate the lease. Thus, this unresolved issue of material fact makes summary judgment inappropriate. We agree with the district court, however, that the notice manifested a clear intention to terminate the sublease. The cases cited by Francis do not preclude the gleaning of unambiguous intent from documents. We therefore find that there was no outstanding issue of material fact, and that MSCC was entitled to summary judgment as a matter of law.
 
 B
 
 36
 Francis argues that reentry and repossession was necessary to terminate the sublease following expiration of the cure period. MSCC in response points to the language of the sublease, "may cancel and terminate this sublease and repossess the premises as of their former estate," and contends that repossession occurs only after termination, not before. See Stoll Oil Refining Company v. Pierce, 337 S.W.2d 263 (Ky.1960) (similar provision). MSCC contends that it had to leave the property immediately upon termination of the sublease or risk damages for trespass. See Id. at 265. We agree. Repossession was not a necessary step in termination of the sublease; MSCC did not abandon the premises by leaving following the expiration of the cure period. In fact, it had no further right to remain.
 
 IV
 
 37
 The sublease restricted MSCC's acquisition of coal lands within the Restricted Area. A covenant imposed three specific duties on MSCC: no acquisition of coal lands within the Restricted Area; notification of Francis of the availability of such coal lands; and assistance to Francis in obtaining such coal lands.
 
 
 38
 Francis asserts that Johnson purchased coal lands within the Restricted Area through M & F and GMC. Francis argues that GMC and M & F are alter egos of MSCC. M & F was the purchasing arm, selling coal to MSCC at a profit. GMC was the contracting arm; it contracted for the mining of the Matewan property and sold this coal to M & F at cost. Thus, Francis contends, MSCC breached the coal land acquisition covenant through these two entities. At trial, a jury found that MSCC had not breached the coal lands acquisition covenant.
 
 
 39
 Francis claims that under Kentucky law, two tests determine whether one corporation is the alter ego of another: first, "[t]hat the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased;" second, "that the facts are such that an adherence to the normal attributes, viz, treatment as a separate entity, of separate corporate existence would sanction a fraud or promote injustice." White v. Winchester Development Corp., 584 S.W.2d 56, 61-62 (Ky.App.1979). MSCC argues that, regardless of what test is used to determine whether GMC or M & F was an alter-ego of MSCC, this court should be reluctant under White to pierce the corporate veil of MSCC:
 
 
 40
 Generally speaking, the corporate veil should only be pierced 'reluctantly and cautiously' and then only in the presence of a combination of the following factors: (1) under-capitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) syphoning off of funds by the predominate shareholder(s) and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities.
 
 
 41
 Id. at 62.
 
 
 42
 We find that the jury's verdict was not against the clear weight of the evidence. At the time the sublease was signed, Johnson and J-G Co. were already involved in coal mining activities in the Restricted Area; Francis had even visited these operations prior to signing the 1975 sublease. Johnson testified that Francis assured him that the restrictive covenants of the sublease were not binding on him personally because he did not sign the sublease in his personal capacity. Johnson maintained separate books, records, and bank accounts for the companies. Johnson contends that he became aware of the Salyer and Matewan properties through purely personal contacts and not through any association with MSCC. MSCC further asserts that M & F and GMC were not signatories to the sublease, and thus are not bound by its coal land acquisitions covenant. Moreover, M & F and GMC did not even exist at the time the last amendment of the sublease was signed in 1977. MSCC contends that if Francis wanted to bind J-G company or Johnson personally, he should have asked them to become parties to the sublease. Since the jury's verdict was not against the clear weight of the evidence, we affirm.
 
 V
 
 43
 Francis contends that Johnson, J-G Co., M & F, and GMC tortiously interfered with MSCC's performance of its duties under the sublease. He claims that if Johnson was an agent of MSCC when Johnson discovered the Matewan and Salyer properties, then MSCC breached its duty by not informing Francis; if, on the other hand, Johnson was not an agent, then he tortiously interfered with MSCC's duty to so inform Francis. The jury found that these parties had not tortiously interfered with MSCC's performance of its duties under the sublease. Francis appealed. Since we have held that MSCC did not breach the coal lands acquisition covenant, an action for tortious interference cannot be sustained. Thus, we affirm the verdict of the jury.
 
 VI
 
 44
 Francis contends that MSCC defrauded him by providing him with altered maps of coal mining activity on and near the Reserves. Francis contends that some of the mines on the Reserves, Salyer, and Matewan properties had their portal on one property but extended onto the other two properties. MSCC was required to send Francis mining plans and projections; on these projections, Francis contends, MSCC deliberately failed to disclose the mines on the Salyer and Matewan properties. In particular, Francis complains that MSCC sent one set of maps to him and a substantially different set of maps to the Kentucky Department of Mines and Minerals. Francis contends that these maps, by "proper practice," should show mining on adjacent properties which could affect mining on the Reserves. Francis does not allege that there is a legal duty to do so.
 
 
 45
 The jury found that MSCC did not defraud Francis; this verdict is not against the clear weight of the evidence, and thus is affirmed. There was evidence to demonstrate that M & F and GMC were different entities than MSCC and thus owed no legal duty to Francis to inform him of the extent of their holdings. Similarly, MSCC had no legal duty to disclose activities of third parties not on the Reserves. Francis can claim no harm by being provided with these incomplete maps of the Reserves; more complete maps would have informed Francis of conditions about which he had no legal right to complain.
 
 
 46
 We therefore AFFIRM the judgment of the district court.
 
 
 
 [1]
 Harry LaViers and G.J. Stollings, Trustees of the Evans and LaViers Real Estate Trust, Arthur Kinnar, Lucy M. Kinnar, Nora Carpenter, and Hallie Golden Davis leased the right to mine and remove all the merchantable and minable coal on the Reserves to nancy L. Fancis and James D. Francis, II on June 16, 1969