UNITED STATES of America, Plaintiff,

v.

WRW CORPORATION,
et al., Defendants.

Civ. A. No. 88–126.

United States District Court,
E.D. Kentucky,
London Division.

March 29, 1991.

See also 731 F.Supp. 237.

---

U.S. Atty., Lexington, Ky., for U.S.

Michael Gmoser, Hamilton, Ohio, for WRW Corp. and Noah and William Woolum.

Stephen Miller, Nashville, Tenn., for Roger Richardson.

## MEMORANDUM

SILER, Chief Judge.

### I. INTRODUCTION

This is an action by the plaintiff, the United States of America (the "USA"), to collect unpaid civil penalties assessed against the defendant, WRW Corporation ("WRW"), from the defendants, WRW and its principals, Noah Woolum ("Noah"), William Woolum ("William"), and Roger Richardson ("Roger") (collectively the "Individual Defendants"). On January 26, 1990, the USA moved the Court for summary judgment against the defendants. For the following reasons, the Court grants the USA's motion for summary judgment.

### II. FACTS

The Individual Defendants purchased a $5,000.00 reclamation bond and $46,500.00 of equipment in the name of WRW and entered into a coal lease with Noah and William, as lessors, and the Individual Defendants, who were listed as WRW's officers, as lessees (the "Lease"). Thereafter, on November 6, 1980, WRW was incorporated in Kentucky. The Individual Defendants were WRW's *sole* shareholders, directors, and officers. WRW's purpose was to mine coal on a 60 acre tract of land owned by Noah and William.

Noah, William, and Roger each subscribed to purchase 100 shares of stock in WRW for the sum of $1,000.00. However, no stock certificates were issued to the Individual Defendants by WRW, and it is not clear whether this $3,000.00 was ever paid to WRW by the Individual Defendants.

On December 22, 1980, Noah purchased a $13,000.00 John Deere tractor for WRW. John Deere would not extend credit to WRW, so WRW purchased the tractor through Noah. On December 26, 1980, Roger completed a loan application at the First National Bank of Southwestern Ohio. The application indicates that WRW wanted to borrow $9,000.00 to purchase a 1972 GMC dump truck for WRW and that the note for the loan was to be signed by each of the Individual Defendants personally.

WRW maintained a separate corporate checking account, and its accountant prepared and filed WRW's federal income tax returns for the fiscal years ending March 31, 1981, and 1982, and WRW's Kentucky annual reports, coal tax returns, and severance returns. In addition, he prepared and filed WRW's 1981 annual report with the Kentucky Secretary of State. However, due to some confusion regarding the correct corporate name and number of shares of stock owned by each of the Individual Defendants, the returns and reports were filed under the name of Woolum Richardson Woolum, not WRW, and indicated that each of the Individual Defendants owned 333 shares of stock in WRW, not 100.

During this two-year period, the Individual Defendants did not receive any salaries for services rendered for WRW, and WRW did not declare or pay any dividends to the Individual Defendants. From time to time, the Individual Defendants did lend their credit to WRW and make unsecured operating loans to WRW to enable it to remain current on its obligations. Nonetheless, WRW's tax returns indicate an operating loss for the two years.

Jess Alford and Paul Jordan signed contracts with WRW to mine the leased coal. On paper, they were independent contractors. In practice, however, the Individual Defendants still exercised direct control over critical aspects of the mine's operation.

After the death of two WRW employees on January 5, 1982, the Secretary of Labor issued approximately 30 separate citations and orders concerning violations of the Federal Mine Safety and Health Act of 1977 ("the Act") to WRW. WRW did not contest the allegation that mandatory health and safety standards had been violated at the mine site. However, WRW did contest the civil penalty assessments against it on the ground that it was not the mine operator.

WRW ceased business as a result of the mining accident, and its equipment was liquidated in satisfaction of its debts. After liquidation, WRW's assets consisted of $217.00 cash and a $5,000.00 reclamation bond. The Individual Defendants had made loans to WRW totalling $12,631.00, which remained unpaid.

An administrative law judge for the Federal Mine Safety and Health Review Commission ("the ALJ") conducted a hearing regarding the civil proceedings against the defendants on November 6, 1984. At the hearing, the USA's counsel advised the ALJ that it was seeking civil penalties against WRW only at that time. On February 19, 1985, the ALJ rendered a decision and upheld the $90,350.00 civil penalty assessment against WRW. The ALJ concluded that WRW constituted an "operator" under the Act and also stated: "I fully expect that, should MSHA find itself unable to collect these penalties from corporate assets, it will pursue collection proceedings against the individual stockholders by piercing the corporate veil. The Facts in this case clearly warrant such proceedings."

On November 19, 1986, the Individual Defendants were indicted for violating the Act. The indictments included allegations that the Individual Defendants constituted mine operators who violated mandatory health and safety standards. At trial, the Individual Defendants insisted that they were not directly involved in the day-to-day operations of the mine. However, the jury

found the Individual Defendants guilty under 30 U.S.C. § 820(d), which provides a criminal penalty for any operator who willfully violates a mandatory health or safety standard.

On May 26, 1988, the USA filed this collection action.

### III. ISSUES

The issues before the Court are:

1. Is the USA entitled to summary judgment against WRW for the $90,350.00 civil penalty assessment?

2. Should the Court pierce WRW's corporate veil and hold the Individual Defendants personally liable for WRW's civil penalty?

3. Are the Individual Defendants statutorily liable for WRW's civil penalty?

### IV. LEGAL AUTHORITIES AND ANALYSIS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (mere scintilla of evidence does not create a genuine issue of material fact, and materiality shall be determined by substantive law); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment is proper, if plaintiff is unable to meet burden of proof after adequate discovery period); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *on remand*, 807 F.2d 44 (3d Cir.1986) (summary judgment is proper in complex cases); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989).

1. *The USA is entitled to summary judgment against WRW.*

■ At the administrative hearing, WRW did not contest the existence of the violations or the correctness of the civil penalty assessment. WRW did argue that it was not the mine operator. However, the ALJ determined that WRW was the mine operator and upheld the $90,350.00 civil penalty assessment against WRW. The ALJ's decision is now final and unappealable.

The USA filed this action against WRW to collect the unpaid $90,350.00 civil penalty assessment. WRW has not raised any defense to enforcement of the ALJ's decision. Accordingly, the Court will grant the USA's motion for summary judgment against WRW.

2. *The USA is entitled to summary judgment against the Individual Defendants.*

A. Common Law Liability.

■ Ordinarily, a corporation is regarded as separate from the individuals comprising it. *Morgan v. O'Neil*, 652 S.W.2d 83 (Ky.1983) (citing *White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56 (Ky.App. 1979)). Shareholder liability is limited as an incentive to business investment. Dodd, *The Evolution of Limited Liability in American Industry*, 61 Harv.L.Rev. 1351 (1948). However, the corporate persona is not inviolate. When a separate legal entity is used to justify wrong, protect fraud, or subvert public policy, then the corporate veil should be pierced and the association of persons making up the corporation should be held responsible for the corporation's financial liabilities. *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 662 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979); *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 956 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977); *Thermothrift Indus. Inc. v. Monotherm Insulation Sys., Inc.*, 450 F.Supp. 398, 405 (W.D.Ky.1978); *Commonwealth v. ABAC Pest Control*, 621 S.W.2d 705, 708 (Ky.App.1981); *Dare To Be Great, Inc. v. Commonwealth*, 511 S.W.2d 224, 227 (Ky.App.1974).

Three theories have been used to pierce the corporate veil: (1) equity; (2) alter ego;

and (3) instrumentality. *White* at 61. The USA relies upon the first two. The Individual Defendants are personally liable for WRW's civil penalty assessment under both of these theories.

### (1) *Equity Theory.*

■ In Kentucky, under the equity theory, the following factors must be considered when determining whether to pierce the corporate veil:

(1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) non-payment or over-payment of dividends; (4) a siphoning off of funds by dominant shareholders; and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities.

*White* at 62; *see also Labadie Coal Co. v. Harry Black, d/b/a FAI Trading Ltd.*, 672 F.2d 92, 97–100 (D.C.Cir.1982).

■ First, the Individual Defendants began operating as WRW, a corporation, prior to WRW's date of incorporation. Then, at a maximum, WRW began business with $3,000.00 of capital plus a $5,000.00 reclamation bond and $46,500.00 of equipment. This capital is insufficient to begin a coal mining operation. To begin a coal mining operation, one must either buy and/or lease mineral rights and adequate mining equipment, obtain appropriate licenses and permits from various governmental authorities, hire and pay employees and professionals, such as accountants and attorneys, and incur other expenses incidental to the mine's operation. As WRW's cash disbursement ledger and associated journal entries prove, even with a $5,000.00 reclamation bond and $46,500.00 of equipment, $3,000.00 of capital is inadequate to begin an undertaking in the highly regulated coal mining industry.

Undercapitalization is problematic, because Kentucky law does not require any minimum paid-in capital before a corporation can begin to do business. *White* at 62. However, public policy should protect innocent third parties who have no way of knowing that they are dealing with an impecunious entity. *Id.* In *White*, the plaintiff would not be heard to complain that the defendant was undercapitalized, because the plaintiff had knowledge of the corporation's financial status and could have protected itself. *Id.* at 63. Here, this is not the situation. The USA cannot demand the posting of collateral or the granting of a security interest from potential violators of the Act.

Second, the only corporate records produced by WRW consist of its Certificate and Articles of Incorporation, Minutes of Organization Meeting of Board of Directors of WRW (the "Minutes"), Waiver of Notice of First Meeting of Shareholders of WRW, and Waiver of Notice of Organization Meeting of Board of Directors. The Minutes simply elect the Individual Defendants to serve as the sole officers of WRW and purport to adopt bylaws of WRW and the form of certificate to represent the shares of stock in WRW. According to the Minutes, the bylaws were to be filed with the Minutes and the specimen certificate was to be inserted in the corporate record book. However, the defendants have not produced the bylaws or the specimen certificate.

Also, while the defendants did produce a Waiver of Notice of First Meeting of Shareholders of WRW, they did not produce the minutes of the first shareholders' meeting. The Articles of Incorporation indicate that the initial board of directors, named in the Articles of Incorporation and consisting of the Individual Defendants, "shall serve until the first meeting of the shareholders, after which the Board of Directors shall consist of a number of persons to be determined by the by-laws of the corporation." However, there is no record of a shareholders' meeting or any corporate bylaws.

Furthermore, the Minutes do not authorize the Individual Defendants to: (1) open a checking account for WRW; (2) sign any loan, mines and minerals license, or other applications or leases on behalf of WRW; or (3) purchase any mining equipment for WRW. The foregoing corporate action requires board of directors' resolutions. KRS 271B.8–010. However, WRW failed to observe these formalities of corporate

existence. Rather, the Individual Defendants, without proper corporate authorization, imposed their "will" upon WRW. Thus, the Individual Defendants' "will" was synonymous with WRW's "will."

Third, WRW never paid any dividends to the Individual Defendants. Dividends are the payments designated by the board of directors to be distributed *pro rata* among the shares of stock outstanding. M.A. Black, *Black's Law Dictionary* (5th ed. 1983). This is the means by which shareholders in a corporation reap the benefit of their investment in a corporation.

Fourth, the Individual Defendants guaranteed WRW's liabilities in their individual capacity, and WRW and the Individual Defendants' funds were commingled. The Individual Defendants made several unsecured loans to WRW. WRW paid its debts with these borrowed funds, but WRW never repaid the Individual Defendants. Furthermore, the Individual Defendants all rendered services to WRW, but none of the Individual Defendants ever received a salary or wages from WRW. In addition, Noah and William leased their property to WRW and coal was mined from the leased property, but neither Noah or William ever received the royalty payments due to them from WRW. Moreover, Noah purchased a John Deere tractor for WRW to use in the mining operation, because WRW did not have the credit necessary to purchase it. Finally, Roger completed a loan application, which indicated that the note for the loan was to be signed by each of the Individual Defendants personally. This action constitutes an indirect, if not a direct, means of the Individual Defendants' guaranteeing WRW's corporate liabilities and a commingling of WRW and the Individual Defendants' funds.

There is no evidence that the Individual Defendants siphoned off WRW's funds. In fact, since WRW was undercapitalized from its inception and operated at a loss during its two years of active existence, there were no funds available. However, under *White*, "a siphoning off of funds by dominant shareholders" is only one of the five factors to be considered when deter-

mining whether to pierce the corporate veil. *White* at 62. Moreover, every other factor specified in *White* indicates that the corporate veil established by the incorporation of WRW should be pierced.

#### (2) *Alter Ego Theory.*

██  In Kentucky, under the alter ego theory, any inquiry into whether piercing the corporate veil is warranted must be predicated upon two questions. *Id.* at 61–62; *Labadie,* 672 F.2d at 96. First, "is there such unity of interest and ownership that the separate personalities of the corporation and its shareholders no longer exist?" *Id.* Second, "if the acts are treated as those of the corporation alone, will an inequitable result follow?" *Id.*

First, as established in Part IV.2.A.(1)., WRW and the Individual Defendants did not have a separate personality. There was a complete merger of ownership and control of WRW with the Individual Defendants.

Second, if the violations of the Act are attributed to WRW alone, then an inequitable result will follow. Namely, WRW, a defunct corporation, does not and will never have assets adequate to pay the civil penalty assessed against it. Moreover, public policy is concerned with protecting citizens. The Act promotes this policy by regulating hazardous activity. WRW's activity violated the Act and resulted in the death of two miners. The Individual Defendants knew about, planned to benefit from, and could have prevented WRW's illegal activity. Accordingly, unless the Individual Defendants are held personally liable for WRW's civil penalty assessment, then the USA will have no means of collecting it, and the Individual Defendants, through WRW, will have defrauded the USA and the public by violating the Act and, then, pleading a lack of personal responsibility and avoiding the sanctions for violating it.

In summary, WRW was incorporated to afford the Individual Defendants limited liability. However, given the complete lack of a viable independent corporate entity, the Individual Defendants do not deserve the protection normally afforded to a cor-

poration's shareholders. The Individual Defendants cannot escape "from the normal consequences of carefree" entrepreneurial activity by hiding behind WRW. *Labadie* at 100. Therefore, the Individual Defendants are personally liable for WRW's civil penalty assessment, and the Court will grant the USA's motion for summary judgment against the Individual Defendants.

B. Statutory Liability.

The Court will grant the USA's motion for summary judgment against the Individual Defendants under common law theories. Accordingly, the Court declines to rule on whether the Individual Defendants are statutorily liable for WRW's civil penalty assessment.