**LABADIE COAL COMPANY, Kentucky Corporation, Appellant,**

v.

**Harry BLACK, Doing Business as FAI Trading, Ltd.**

No. 81–1014.

United States Court of Appeals, District of Columbia Circuit.

Argued 16 Nov. 1981.

Decided 16 Feb. 1982.

Maxwell A. Howell, Washington, D. C., for appellant.

F. Murray Callahan, Washington, D. C., for appellee.

Before WRIGHT and WILKEY, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Labadie Coal Co. (Labadie) contends that the district court erred in dismissing its

action holding appellee Black personally liable for money allegedly owed for coal sold to or through an entity called F.A.I. Trading, Ltd. (FAI). Labadie is right. We vacate the district court's judgment and remand this case for the district court to reopen the record and allow further discovery if requested.

## I. BACKGROUND

Appellant Labadie is a Kentucky corporation engaged in processing and selling coal at its plant in South Williamson, Kentucky. Appellee Black is the director, president, and sole employee of FAI, which is styled as a "closely held family corporation," organized in August 1977 under the laws of Virginia. Acting through FAI, Black presented himself to serve as a "broker" between buyers and sellers of coal.

On 24 May 1978 Black visited Labadie's coal preparation plant to inspect the facility and to inquire about purchasing coal. Agreements were struck between Black and Labadie, calling for purchases from Labadie and the use of Labadie's facilities for shipping coal which FAI was to purchase from other sources. Labadie delivered coal under the contracts until late 1978, when it terminated its relationship with Black (or FAI) because FAI was behind in its payments on account.[1] Suit was brought in United States District Court for the District of Columbia, seeking $109,228.90 allegedly owed for shipments made.

Immediately prior to trial, defendant Black, who remained *pro se* throughout the proceedings, moved to dismiss the action on the ground that process had been served on him individually, that he had no business relationship with Labadie in his individual capacity, and that he could not be held personally liable for FAI's corporate obligations, if any. The district court, following a nonjury trial, dismissed the action with prejudice, "but only as to the issue of Harry Black's individual liability."[2] The court found that Labadie did not establish that FAI was a fiction,[3] and that it failed to pierce the corporate veil.[4]

## II. DISCUSSION

Appellant's principal contentions before this court are twofold: (1) that the trial court erred in admitting documents relating to the corporate existence of FAI, produced for the first time at trial despite plaintiff's repeated requests for the same documents during discovery; and (2) that the trial court erred in refusing to pierce FAI's corporate veil to hold Black personally responsible for the money owing. We examine each in turn.

### A. *Admission of Corporate Documents*

On 12 May 1980 counsel for Labadie filed notice to defendant directing him to appear for deposition and to produce any books, records, or documents

> relating to the purchase and sale of coal between Plaintiffs and Defendant or any corporation or company controlled or operated by Defendant during the years 1978 up to date as well as all books, records and documents relating to or concerning the existence of any corporate entity controlled by or operated by Defendant dealing with the sale and purchase of coal ... including any corporate income tax returns, both federal and local, and other tax memoranda and also the federal and local income tax returns of Defendant, all for the years 1978 and 1979.[5]

During three days of depositions over a period of two months—and even during the first two days of trial[6]—much of the docu-

---

1. Trial Transcript (Tr.) at 34. At one point, the outstanding balance allegedly owed Labadie was $242,161.80.

2. *Labadie Coal Co. v. Black*, No. 80–0679, mem. op. at 8 (D.D.C. 31 Oct. 1980) (hereinafter, "mem. op.").

3. *Id.* at 6.

4. *Id.* at 8.

5. Notice of Deposition and Production of Documents, Appendix at 6–7.

6. *See* Tr. at 283–93.

mentary evidence requested was alluded to but never produced, despite defendant's assurances that he would do so. For example, at the first deposition the following exchange occurred with reference to FAI:

Q. How many shares of stock are outstanding in the company . . . ?

A. I will have to furnish this, I don't know.

. . . .

Q. Do you have with you the minute book, bylaws, and stock book of the company?

A. No, I do not. I will furnish that.

Q. You understand that under the notice to produce you are to bring those documents?

A. No, I don't. I was supposed to bring documents, but what did you want, the minute book, stock book—

Q. Minute book, stock book, and bylaws. That would probably save several questions.

A. I will deliver that to you within 48 hours.[7]

Later on the same day:

Q. Cancelled checks and transportation documents to the extent you have them—

A. You've got them. I can give you that quickly.[8]

At the second deposition, Black produced a "stock book" made up of several blank certificates stapled or clipped together. Four stubs showed that a total of 130 shares had been issued to Black's wife and three children. Letters, purchase orders, and lab test forms bearing the name of FAI Trading, Ltd., were also offered as evidence of FAI's corporate existence, but no "official" corporate documents were produced. Black's excuse for failing to supply additional evidence of corporate existence was that some of the other documents and records sought were lost or misplaced during a move to a new office. Again, Black agreed

to advise Labadie's counsel immediately if the relevant documents were found.[9] The requested materials were not produced at the third deposition, or during the nearly three-month period between the discovery cutoff date, 31 July 1980, and the trial date, 16 October 1980.

On the third and final day of trial, after the plaintiff had rested, Black produced for the first time a certificate from the Commonwealth of Virginia, some cancelled checks, check stubs, bills, and a lease bearing FAI's name, offering them to establish FAI's corporate existence. Notwithstanding Labadie counsel's clear and timely objections,[10] the trial court admitted the evidence and relied upon it to find that FAI was a viable corporate entity. In this it erred.

Rule 26(e) of the Federal Rules of Civil Procedure governs the supplementation of responses to discovery:

A party is under a duty seasonally to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.

While the present record is far from clear on any point, it appears that the defendant may have deliberately withheld the documents and information sought during discovery. At the least, FAI's records were in such disarray that Black could not locate the material requested without an effort which he was unwilling to make prior to the last moments of trial itself. In either case, the failure to produce the ordinary corporate records would have justified drawing

---

7. Deposition of Harry P. Black, Transcript (Dep.Tr.) at 6, 8.

8. *Id.* at 132.

9. Dep.Tr. at 309, 311, 316, 318, 377, 378.

10. Tr. at 357–62, 372, 383, 395, 409.

the normal inferences against Black as one who should have been able to produce those documents. Whatever may have been the actual reason for the failure to supplement his responses during discovery, the fact remains that he agreed during sworn deposition to provide Labadie with relevant documentation, and breached his duty under Rule 26(e) by failing to do so.

Rule 26(e) does not contain a specific sanction for failure to supplement discovery. Nevertheless, "[f]ew would question a court's inherent power to discipline breaches of [the rule], even in the absence of a court order."[11] Discovery sanctions are commonly left to the discretion of the trial court, but as a reviewing court we are not prevented from stepping in where, as in this case, the exercise of that discretion effectively rewards the errant party and unwarrantedly prejudices his opposition.

It was grossly unfair for the court to allow Black to produce corporate documents in the last hours of trial which plaintiff had been demanding throughout pretrial discovery. The court's failure to bar defendant's tardy production of the documents increased plaintiff's burden to discount FAI's corporate status, while at the same time depriving plaintiff of the opportunity to meet (or attempt to meet) that burden. Plaintiff was caught having rested its case when the documents were finally produced, and had little, if any, time effectively to inspect the documents and meaningfully to cross-examine Black as to their content and relevance. While a motion for continuance or other formal attempt to gain time adequate to examine carefully "surprise" evidence might normally have been appropriate, it is apparent from the record that a motion for such relief would have been a vain gesture. The court had made very clear that the trial, which already had languished for too long, would end that day:

THE COURT: Everything we hear in this case we will hear today, Sir. We have to put an end today . . . and everything we are receiving is going to be as of today.[12]

In *Gebhard v. Niedzwiecki*[13] the court observed:

In cases where there is an honest mistake and the harm can be undone, it may frequently occur that a continuance or some other remedy would be adequate, but, where the violation is willful *and the party guilty of the violation seeks to take advantage of it at a time when the harm cannot be undone,* suppression of the evidence may very well be the proper and only available remedy.[14]

This is such a case.

We recognize that the court's admission of the subject evidence over plaintiff's objection may have been in great part a result of its frustration over the overall tenor of the proceeding and of its desire to have the matter completed so that it could in an organized manner review all evidence and the trial transcript together to arrive at a reasoned judgment. We sympathize, in reading through the trial transcript, with the court's exasperated efforts to control the proceeding and the defendant's *pro se* representation. However, while efforts to maintain control over the pace and direction of trial in the face of a *pro se* defense may require the court to overlook occasional procedural irregularities and at times to assist the defendant where appropriate, it does not justify any "overcompensation" for the *pro se* party, as may have unconsciously occurred in this case. The choice to defend oneself, particularly by one with apparent means to hire an attorney,[15] does not excuse a defendant from appropriate penalties of

11. *Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir. 1980).

12. Tr. at 384.

13. 265 Minn. 471, 122 N.W.2d 110 (1963).

14. 122 N.W.2d at 115 (footnotes omitted) (emphasis added).

15. We are not dealing here with an impecunious defendant. We are dealing with a man who, either on his own behalf or on behalf of a closely held corporation, allegedly purchased hundreds of thousands of dollars' worth of coal on credit, resold it, and then failed to pay.

nondisclosure, even if he may not be as fully aware of them as a trained practitioner.

It was error for the court to have admitted the evidence in question and to have relied upon it, as it clearly did, to find that FAI was a viable corporate entity. If the court was unwilling to prolong the proceeding to permit plaintiff the opportunity to use the evidence in issue, its production should have been barred altogether. We are not convinced that the existence of the corporate entity was established. The relevant time period for the issue of FAI's alleged corporate existence is not 1980, or even 1979, but 1978, the year during which a business relationship existed between FAI or Black and Labadie. From our examination of the record, FAI's viable corporate existence in 1978, or even Labadie's awareness of a purported corporate status (as opposed to a mere "d/b/a" or assumed business name under which Black operated), remains to be proved.

### B. *Piercing the Corporate Veil*

The question of whether the corporate veil should be pierced under the instant circumstances becomes relevant only if it is established that the corporate entity itself exists. Even then, any conclusion that FAI enjoyed a formal corporate status merely *leads,* in a sense, to the question of whether the veil ought to be pierced. *It does not settle it.*

The attention given by the district court to the question of whether the veil ought to be pierced was plainly inadequate on the existing record. Of course, our order here that the record be reopened and that further discovery be permitted, also reopens the trial court's disposition of the piercing issue. That being so, it seems advisable, in the interest of judicial economy, to guide the trial court's second-round analysis of the expanded record by outlining important considerations bearing on the question of individual over corporate liability.

### 1. *The Purpose of the Veil*

The common purpose of statutes providing limited shareholder liability is to offer a valuable incentive to business investment.[16] Although the greatest judicial deference normally is accorded to the separate corporate entity, this entity is still a fiction. Thus, when particular circumstances merit—*e.g.,* when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation—courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for "corporate" obligations. Several factors have been identified as helpful in deciding when to pierce the corporate veil, as in *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,*[17] noted by the trial court. The guidelines offered in that case are valid and helpful, but are less than a comprehensive catalogue of inquiries which should be made in this case. On our examination of the record as it stands, we emphasize the following considerations which the district court should include in its examination on remand.

In evaluating the factors outlined below, it is helpful to group them under a two-prong test: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?[18] Relevant to the first question is the issue of the degree to which formalities have been followed to maintain a separate corporate identity. The second question looks to the basic issue of fairness under the facts.

### 2. *Formalities*

■ Individuals who wish to enjoy limited personal liability for business activities

---

**16.** This has been called the most important legal development of the 19th century. Dodd, *The Evolution of Limited Liability in American Industry,* 61 Harv.L.Rev. 1351 (1948).

**17.** 540 F.2d 681 (4th Cir. 1976).

**18.** *See United States v. Standard Beauty Supply Stores, Inc.,* 561 F.2d 774, 777 (9th Cir. 1977).

under a corporate umbrella should be expected to adhere to the relatively simple formalities of creating and maintaining a corporate entity. In a sense, faithfulness to these formalities is the price paid for the corporate fiction, a relatively small price to pay for limited liability. Furthermore, the formalities are themselves an excellent litmus of the extent to which the individuals involved *actually view the corporation as a separate being.* In that respect, the following factors, identified in other cases, may be appropriate to the question of whether the corporation and the individual have maintained separate personalities. It is clearly not necessary that all of these factors be present in a given case to justify piercing the veil.[19]

(a) *The nature of the corporate ownership and control.*

This court has previously suggested that a corporate form may be ignored whenever an individual so dominates his organization "as in reality to negate its separate personality." [20] The trial court pointed out, in distinguishing this case from *DeWitt,* that the corporation in *DeWitt* was found to be a mere facade for the operations of the dominant stockholder. In the present case, the court noted, *"Mrs. Black is the dominant stockholder."* [21] If the court meant to imply by this distinction that Mr. Black could not be held liable for the corporate debt because he technically is not a shareholder in the corporation, we think it missed the point.

The question before the court in a case like this is whether the corporation, rather than being a distinct, responsible entity, is in fact the alter ego or business conduit *of the person in control.* In many instances, the person "controlling" a close corporation is also the sole, or at least a dominant,

shareholder.[22] In other cases the controlling person may seek to avoid personal liability by not formally becoming a shareholder in the corporation. The question is one of control, not merely paper ownership.

It is apparent from the existing record that Mr. Black is in fact the dominant figure in FAI enterprises even though he *formally* controls no shares. The fact that the stock may be in his wife's name rather than in his may be of little consequence in the court's consideration of the entire picture. It is only by Black's testimony that it was Mrs. Black who made the initial capital outlay for FAI, and that she, not he, holds the financial stakes in the enterprise. On the other hand, the record also shows that this initial investment, or stock purchase, was by a $5,000 check, drawn upon a *joint bank account* and *signed by Mr. Black.* Moreover, Mr. Black alone holds the reins of FAI's activities. It was certainly by his actions alone that a relationship with plaintiff was established and business transacted.

We have no evidence of other enterprises in which Mr. Black may be engaged. We do not know whether Black's business through FAI is everything he does. We simply note that to the degree that there is an identity of interests between FAI and Black individually, whatever his formal capacity, there is an increased justification, all other things equal, to disregard the corporate entity.

(b) *Failure to maintain corporate minutes or adequate corporate records.*

The failure of defendant to produce any corporate records, such as minutes, bylaws, articles of incorporation, lists of directors, and so on, creates a strong inference that these records do not exist. That they may have existed at one time is of no conse-

19. *Martin v. Pilot Indus.,* 632 F.2d 271 (4th Cir. 1980); *International Union, U.A.W. v. Cardwell Mfg. Co., Inc.,* 416 F.Supp. 1267 (D.Kan.1976). As a noted commentator correctly observes, each case "should be regarded as sui generis, to be decided in accordance with its own underlying facts." 1 Fletcher, Cyclopedia of Corporations § 41.3 at 191 (Cum.Supp.1981).

20. *Quinn v. Butz,* 510 F.2d 743, 758 (D.C.Cir. 1975).

21. Mem. op. at 7 (emphasis added).

22. *See Valley Fin., Inc. v. United States,* 629 F.2d 162, 172 (D.C.Cir.1980).

quence. We are concerned here with how defendant has in fact treated the corporation. If FAI has been viewed as a separate and distinct entity, one would expect appropriate records to be kept. If it is merely a separately-named business conduit for defendant's own activities, a "d/b/a" in all practicality, such records would not be as important and therefore might not be carefully maintained.[23]

To compound Black's failure to produce records, there is no evidence that FAI's directors, whoever they are, have ever played a meaningful role in FAI's activities, or have even formally held a meeting. It appears from the record—especially from Black's own testimony—that he alone controlled FAI and made all decisions.

>  (c) *Failure to maintain the corporate formalities necessary for issuance or subscription to stock, such as formal approval of the stock issue by an independent board of directors.*

The only evidence in the record relating to the stock of this corporation is a somewhat informal "stock book" of blank certificates and indications on stubs from which the certificates have been removed that 130 shares have been issued to defendant's wife and three children. There is no indication that any stock issue was authorized, or even of how issues were to be authorized. Defendant testified at deposition that his wife, owner of 100 shares, was the principal shareholder and indicated that the shares given subsequently to their children were from those 100 shares. We observe, however, that the "stock book" itself does not reflect such a breakdown. There is no indication that Mrs. Black was ever reissued stock reflecting ownership of the 70 shares that normally would have remained following distribution of 30 shares to the Black children. There is no record of an authorized issue to anyone of shares beyond the 100

Mrs. Black was evidently issued. To compound our confusion, the trial court found that four and not three children held stock in the corporation.[24]

One thing only is clear: whatever the precise status of FAI stock, issued or unissued, authorized or unauthorized, it is not revealed in the packet offered by Black as FAI's stock records. We point this out only as an indication that the stock-related practices of the corporation lacked much of the record formality one would expect, even of a closely-held corporation. This should be a consideration in determining whether the corporation exists beyond the "Ltd." in FAI's name.

>  (d) *Commingling of funds and other assets of the corporation.*

Although no evidence of such a commingling was presented by the plaintiff in this case, a key source of any such evidence would have been the checks and financial records, both of Black and of the corporation. These were all denied plaintiff by defendant's failure to produce them. Labadie should be afforded appropriate opportunity to conduct a thorough discovery into these and other documents that might show such a commingling.

>  (e) *Diversion of the corporation's funds or assets to non-corporate uses such as the personal uses of the corporation's shareholders.*

Again, Labadie's failure to present evidence of diversion was more clearly the result of frustrated efforts to discover defendant's records than of the nonexistence of such evidence. It was not possible, for example, without the production of the corporate checkbook(s) to determine whether monies in corporate accounts were used to cover unrelated personal or business expenses. Yet the treatment of corporate

---

**23.** Additional evidence that FAI's separate corporate identity has not been honored is Black's revelatory testimony at trial that FAI has never even filed a federal or state tax return, other than withholding tax reports (which are required of all individuals—corporate or not—who withhold taxes from employees' paychecks). Tr. at 302–04.

**24.** Mem. op. at 1.

assets as one's own has been a factor in other veil-piercing cases.[25]

The court may also take a close look at the salaries paid to defendant Black, his wife or other members of his family, if raised in evidence, and should be sensitive to possible asset diversion through these salaries. Asset diversion may be inferred from disproportion between the salaries paid and the services actually rendered to the corporation. The existence of such disproportion does not necessarily indicate any wrongdoing as such; it is simply an indication that the corporation is not being treated as an entity separate from Black or the family interests.

(f) *Use of the same office or business location by the corporation and its individual shareholders.*

Black testified that although there is a corporate office in Washington, D.C., bearing the name of FAI Trading, Ltd., much of his business necessarily occurs after business hours in telephone conversations with mining operators or owners to and from his own home phone. This is another factor which we believe bears on the whole picture of the precise relationship between Black and FAI.

### 3. *The Element of Unfairness*

The court correctly observed that fraud is not a prerequisite in a suit to disregard a corporate fiction. It pointed to language in *DeWitt* to the effect that a case must only "present an element of injustice or fundamental unfairness"[26] to justify the court's piercing the veil. The court simply found that this factor was absent in the *Labadie Coal* case. We disagree.

Ultimate resolution of at least one issue raised at trial may provide the required "injustice" to the court's evaluation. That issue is whether there was a failure adequately to capitalize the corporation for the reasonable risks of the corporate undertaking. As the Supreme Court has observed,

The cases of fraud make up a part of that exception [which allows the corporate veil to be pierced] .... But they do not exhaust it. An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability.[27]

It is far from clear in the present case that the initial $5,000 investment in FAI, made over four years ago, and followed by several years of failure of corporate profit, remains an adequate capitalization of even this corporation. Of course, we have no full picture of the corporation's overall assets and liabilities, due in large part to the absence on the record of any evidence offered by defendant of the corporation's financial position. (Black went so far at trial as to say that the corporation in fact had no balance sheet, at least not one on which he was prepared to rely.)[28]

Whether capitalization is adequate is understandably a function of the type of business in which the corporation engages. A broker in the pure sense, *i.e.*, one who simply arranges transactions between buyers and sellers of commodities, may have less reason for high levels of capitalization than a company which actually purchases commodities for resale. Although Black described FAI's business as that of a brokerage of sorts, the trial court would be justified in looking closely at the nature of the business actually conducted, including the types of liabilities that FAI might be expected to incur in the normal course of its dealings with suppliers and purchasers, before concluding that existing capital, whatever it is, is adequate under the circumstances.

---

**25.** *See, e.g., Valley Fin., Inc. v. United States,* 629 F.2d at 172.

**26.** *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d at 687.

**27.** *Anderson v. Abbot,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944) (citations omitted).

**28.** Tr. at 301–02.

We recognize the position of some commentators that undercapitalization should not play an important part in contract cases, principally because a person dealing with a corporation in a contract setting is expected to have had the opportunity to investigate the corporation with which it deals, and essentially to have assumed the risk that the corporation may prove unable to meet its financial obligations.[29] This position has not been adopted by most of the courts who have considered the problem, however. Furthermore, as another commentator has noted, "If the prior opportunity to investigate is a consideration, then the plaintiffs' lack of sophistication is equally tenable against the presumption that they knowingly assumed the risk of the corporation's undercapitalization."[30]

This is only a single example of how the "unfairness" prong of the piercing test may be satisfied in this case, depending on the eventual findings on remand. There may be others. The "errant" party need not have willfully wronged the other party, nor need he have engaged in anything amounting to fraud in their relationship. The essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of *carefree* entrepreneuring by doing so through a corporate shell.

The determination of whether there was unfairness in this case, whether from undercapitalization or from some other aspect of Black's use of FAI in his business relationship with Labadie, was inadequately considered by the trial court in deciding that the veil could not be pierced. The entire picture of the relationship between Black and Labadie, the representations made, the question of whether the corporation actually existed at that time, as well as many of the factors listed in the formalities section of this discussion, should all be considered in the court's evaluation.

### 4. *An Issue of Fact*

The ultimate evaluation of all factors bearing on whether FAI's corporate identity should be ignored is a matter for the trial court's discretion, but, of course, a discretion soundly exercised. Since the record is to be reopened, we do not speak as to the ultimate outcome. We do emphasize, however, that a corporation need not be a sham entity in an absolute sense to be ignored. We leave it to the district court on the expanded record and after appropriate discovery to make its own determination consistent with these guidelines.

### III. CONCLUSION

We have closely examined the entire record in this matter and genuinely sympathize with the district court's valiant efforts to control the trial phase of this case. Under the circumstances, however, the court's desires to order the trial and to keep it within reasonable time limits, as well as its attempts to compensate for defendant's disorganization by admitting evidence produced only at the last minute, worked prejudice to plaintiff's attempts to justify its action against Black individually. Under the circumstances, the chances that the court's dismissal might work substantial injustice may not be ignored. For this reason, and for reasons outlined above, the order of the district court dismissing the case against defendant Black is vacated, and the case is remanded to the trial court with instructions that the record be reopened and further discovery be permitted, if requested. The plaintiff should be allowed the fullest discovery into defendant Black's private financial records, as well as FAI's corporate records (such as they are), to determine facts bearing on whether FAI's corporate existence should be ignored in this case. The district court may make such determinations upon the expanded record as are appropriate on the facts and under the guidelines provided herein.

*So ordered.*

---

**29.** *See, e.g.,* Note, *Disregarding the Corporate Entity: Contract Claims,* 28 Ohio St.L.J. 441 (1967); Bradley, *A Comparative Evaluation of the Delaware and Maryland Closed Corporation Statutes,* 1968 Duke L.J. 525, 554.

**30.** Barber, *Piercing the Corporate Veil,* 17 Willamette L.Rev. 371, 386 (1981).