OPINION
 

 STANLEY S. HARRIS, District Judge.
 

 Plaintiff, a Washington, D.C., law firm, filed this lawsuit to recover unpaid attorney’s fees from several California defend
 
 *17
 
 ants.
 
 [1]
 
 Two of the defendants — Colleen Coffman (“Colleen”) and Coffman Specialties, Inc. (“Specialties”) — moved to dismiss for lack of personal jurisdiction. On September 30, 1998, the Court deferred consideration of that motion pending an evidentiary hearing. The Court held an evidentiary hearing on February 12, 1999. Before the Court are four matters: (1) Colleen’s and Specialities’ motion to dismiss for lack of personal jurisdiction; (2) plaintiffs motion to strike the affidavit of Carol L. O’Riordan (“O’Riordan”); (3) plaintiffs motion to supplement the evidentiary record with documents produced by defendants on February 12, 1999; and (4) Colleen’s and Specialties’ request, in their opposition to plaintiffs motion to supplement the evidentiary record, to supplement the record with additional documents that they produced on February 18, 1999.
 
 [2]
 
 Upon consideration of the entire record, the Court grants defendants’ motion to dismiss for lack of personal jurisdiction as to Colleen, but denies it as to Specialties. The Court also grants plaintiffs motion to strike O’Riordan’s affidavit, grants plaintiffs motion to supplement the evidentiary record, and denies defendants’ request to supplement the evidentiary record. “Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56.” Fed.R.Civ.P. 52(a);
 
 Summers v. Department of Justice,
 
 140 F.3d 1077, 1079-80 (D.C.Cir.1998). Nonetheless, the Court sets forth its reasoning.
 

 I.
 
 Motion To Strike O’Riordan Affidavit
 

 Plaintiff moves to strike the O’Riordan affidavit, which was appended to Colleen’s and Specialties’ Post-Hearing Statement. O’Riordan is one of plaintiff’s former employees who testified at the February 12, 1999, hearing. Plaintiff contends that O’Riordan’s affidavit contains alleged conversations she had with Colleen, additional details on some topics addressed in her testimony, and information on entirely new topics. Plaintiff submits that the affidavit should be stricken for two independent reasons: that the affidavit (1) is inadmissible under the hearsay rule, and (2) constitutes an impermissible and unfair effort to supplement the evidentiary record developed at the hearing. Colleen and Specialties argue that the affidavit is not hearsay and that it does not offer any new material facts.
 

 The Court need not rely on either of plaintiffs arguments but will strike the affidavit for being untimely.
 
 [3]
 
 The Court expected that in holding an evidentiary hearing, the parties would present all their evidence at the hearing because such a forum provides a fair opportunity for the parties to present their evidence and cross-examine opposing witnesses. Fur
 
 *18
 
 thermore, when a motion is supported by affidavit, the affidavit should be served with the motion, and opposing affidavits should be served “not later than 1 day before the hearing, unless the court permits them to be served at some other time.” Fed.R.Civ.P. 6(d);
 
 see Lujan v. National Wildlife Federation,
 
 497 U.S. 871, 894-96, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (affirming district court’s rejection as untimely of additional affidavits submitted after oral argument on summary judgment motion and in purported response to the district court’s post-argument request for additional briefing). As the Court did not permit affidavits to be submitted after the hearing, the Court strikes the O’Riordan affidavit.
 

 II.
 
 Motion To Supplement Evidentiary Record
 

 Plaintiff moves to supplement the evi-dentiary record with documents that Colleen and Specialties untimely provided on February 12, 1999, the day of the hearing, and thus, those documents were not admitted into evidence at the hearing. Colleen and Specialties do not object. The Court grants plaintiffs motion to supplement the evidentiary record with respect to the corporate records appended to plaintiffs Motion To Supplement Evidentiary Record.
 

 In their opposition, Colleen and Specialties request that the record also be supplemented with corporate records dating from March 1993 onward.
 
 [4]
 
 Colleen and Specialties explain that these documents were inadvertently omitted from the document production on February 12,1999, and were produced on February 18, 1999, via Federal Express after plaintiff informed Colleen and Specialties that it planned to supplement the record with only the corporate records it had received at that point. Plaintiff opposes the request because Colleen and Specialties are untimely in their production, and because such a production would be unfair since plaintiff did not address those corporate documents at the hearing or in its post-hearing statement.
 

 The Court declines to admit the additional documents. Defendants originally agreed to produce all the documents responsive to plaintiffs Fourth Request for Production of Documents by February 9, 1999, as the Court had scheduled the evidentiary hearing for February 12, 1999. On February 8, 1999, however, defendants objected to producing the documents, citing plaintiffs failure to allow 30 days to respond to the document request. The dispute was submitted to United States Magistrate Judge Alan Kay, who on February 10, 1999, promptly compelled defendants to “produce all documents responsive to Plaintiffs Fourth Request for Production of Documents to Plaintiffs attorney no later than close of business on February 11, 1999.” Defendants, however, did not produce the documents until February 12, 1999, the day of the Court’s evidentiary hearing, allowing plaintiff no time to inspect and use those documents at the evidentiary hearing. The Court has already showed leniency in allowing the admission of the documents that arrived on February 12, 1999. Even if defendants’ omission was inadvertent, defendants’ behavior generally in responding to plaintiffs document request has required extra court time and hindered plaintiffs presentation of its case at the evidentiary hearing. Admitting the additional documents that were submitted on February 18, 1999, would prejudice plaintiff who should have had all the requested docu
 
 *19
 
 ments in advance of the evidentiary hearing to present its case for the Court. Furthermore, plaintiff would have to revisit its arguments in light of defendants’ late submissions.
 
 See Labadie Coal Co. v. Black,
 
 672 F.2d 92, 95 (D.C.Cir.1982) (reversing district court’s decision to admit corporate documents produced in the last hours of trial where “plaintiff was caught having rested its case when the documents were finally produced, and had little, if any, time effectively to inspect the documents and meaningfully to cross-examine [defendant] as to their content and relevance.”) The Court declines to delay the briefing of this issue further. Accordingly, the Court denies defendants’ request to admit documents that were produced after February 12, 1999.
 

 III.
 
 Motion To Dismiss for Lack of Personal Jurisdiction
 

 The Court now considers whether it has personal jurisdiction over Colleen and Specialties. Colleen is the President and Responsible Managing Owner of Specialties, a concrete paving subcontractor incorporated in 1991. She is also the wife of James Coffman (James), another defendant who is the president of Coffman Construction. The contract at issue in this lawsuit was signed by James, Coffman Construction, and R.E. Hazard, Jr., (the three other named defendants in this action) regarding a California state lawsuit over school construction (“school litigation”). The parties agree that neither Colleen nor Specialties was a party to this contract.
 

 Because Colleen and Specialties did not contract for the legal services, and because they are not residents of the District of Columbia, they assert that they do not maintain sufficient contacts with the District of Columbia to support personal jurisdiction. Plaintiff argues that personal jurisdiction exists over Colleen because she established minimum contacts with the District of Columbia. Plaintiff argues that personal jurisdiction is obtained over Specialties because it functioned as an alter ego of Coffman Construction, over which the Court does have personal jurisdiction, from the period of September 1994 through March 1996. (Plaintiff provided legal services to Coffman Construction from October 24, 1994, until September 1995, and filed this lawsuit in May 1996.)
 
 See Labadie,
 
 672 F.2d at 96 (the relevant time period for examining whether two entities are alter egos is the time during which a business relationship existed between plaintiff and defendant).
 

 On September 10,1998, the Court granted plaintiffs request to engage in jurisdictional discovery, after plaintiff indicated that discovery had revealed additional facts supporting its alter ego theory. The parties presented their evidence at the hearing on February 12, 1999. Based on the entire record, the Court finds that personal jurisdiction exists over Specialties on the alter ego theory, but not over Colleen.
 

 A.
 
 Legal Standard
 

 District of Columbia law controls the extent to which the Court may exercise personal jurisdiction over a nonresident defendant.
 
 See Crane v. Carr,
 
 814 F.2d 758, 762 (D.C.Cir.1987). D.C.Code § 13-423(a)(1) provides that the Court “may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person’s ... transacting any business in the District of Columbia.” This provision allows for jurisdiction to the fullest extent permissible under the due process clause of the United States Constitution, and “its construction is subsumed by a due process analysis.”
 
 Fisher v. Bander,
 
 519 A.2d 162, 163 (D.C.1986);
 
 see Schwartz v. CDI Japan, Ltd.,
 
 938 F.Supp. 1, 4 (D.D.C.1996). Exercising personal jurisdiction over a nonresident defendant will not violate the due process clause if the defendant has “minimum contacts” with the District of Columbia such that the exercise of personal jurisdiction will not offend the “tradi
 
 *20
 
 tional notions of fair play and substantial justice.”
 
 See International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This “minimum contacts” requirement must be met with respect to each defendant.
 
 See Rush v. Savchuk,
 
 444 U.S. 320, 332, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980);
 
 First Chicago Int’l v. United Exchange Co.,
 
 836 F.2d 1375, 1378 (D.C.Cir.1988).
 

 Ordinarily a plaintiff need only establish a prima facie case that personal jurisdiction exists in order to survive a motion to dismiss.
 
 See Crane v. New York Zoological Soc’y,
 
 894 F.2d 454, 458 (D.C.Cir.1990). However, where the parties are permitted to conduct discovery on the jurisdictional issue, a plaintiff must prove that personal jurisdiction exists by a preponderance of the evidence.
 
 Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,
 
 918 F.2d 1039, 1043 (2d Cir.1990).
 

 B.
 
 Personal Jurisdiction Over Colleen
 

 Plaintiff argues that personal jurisdiction exists over Colleen because she maintained minimum contacts with the District of Columbia. Plaintiff notes that persons who seek legal counsel within a forum “may be subject to personal jurisdiction in that forum for failure to pay legal fees.”
 
 Law Offices of Jerris Leonard v. Mideast Systems, Ltd.,
 
 630 F.Supp. 1311, 1313 (D.D.C.1986). While Colleen did not sign the retainer agreement at issue, plaintiff argues that Colleen effectively sought legal services for two reasons: (1) her husband James made an oral, and later written, representation that he and Colleen gave “a personal guarantee” to pay the legal fees, and (2) Colleen gave a credit card (either a personal card or a Specialties corporate card) that bore her name to one of plaintiffs attorneys to cover travel expenses incurred during the litigation for which plaintiff was retained.
 

 The Court finds that these alleged contacts do not meet the preponderance of the evidence standard. First, the “personal guarantee” was given by James, not Colleen. Furthermore, nothing in the record establishes that James was authorized to give Colleen’s personal guarantee. The Court therefore finds no justifiable reason to attribute this contact to Colleen.
 

 The lone fact that Colleen gave one of plaintiffs attorneys a credit card to pay for some travel expenses is insufficient to obtain personal jurisdiction over Colleen under the preponderance of the evidence standard. In some cases, a single act can support jurisdiction if it creates a “substantial connection” with the forum.
 
 Burger King Corp. v. Rudzewicz,
 
 471 U.S. 462, 475
 
 &
 
 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). To determine what constitutes sufficient contacts, the Court looks to factually similar cases, as no mechanical test exists. In
 
 Freiman v. Lazur,
 
 the Court found that a nonresident defendant’s single meeting in the District of Columbia was not a substantial connection, given that the contracts at issue were executed and performed outside the District of Columbia, the defendant’s office was outside the District, and all the parties resided and worked outside the District. 925 F.Supp. 14, 25-26 (D.D.C.1996). In cases involving recovery of legal fees, courts have looked to several factors. In
 
 Law Offices of Jerris Leonard,
 
 the court found jurisdiction where defendants retained plaintiffs legal services, much of the legal work was performed in the forum, and defendants made several trips to the forum regarding the legal work. 630 F.Supp. at 1313. In
 
 Hummel v. Koehler,
 
 the court found that defendants maintained contacts with plaintiff for legal services that lasted more than a year and involved a variety of tasks, was present in the forum on at least three separate occasions, and derived economic benefit from employing the plaintiffs. 458 A.2d 1187, 1190-91 (D.C.1983). In
 
 Fisher v. Bander,
 
 the court found that defendant requested plaintiffs legal services and was physically present in the forum at least once in con
 
 *21
 
 nection with the legal services. 519 A.2d 162, 164 (D.C.1986).
 

 Unlike these cases, plaintiff does not allege that Colleen has been physically present in the District of Columbia. Nor did Colleen’s provision of the credit card create a contract for services with plaintiff. Moreover, it is not clear that, by giving a credit card that may or may not have been a personal card, Colleen personally derived economic benefit or “availed [herself] of the special benefits of doing business with a Washington, D.C. law firm.”
 
 See Fisher,
 
 519 A.2d at 164. The Court finds that Colleen’s single act of providing a credit card to one of plaintiffs attorneys to cover some travel expenses does not create a substantial connection to the District of Columbia. Consequently, the Court dismisses Colleen from this action.
 

 C.
 
 Personal Jurisdiction Over Specialties
 

 Plaintiff argues that personal jurisdiction may be obtained over Specialties because it is an alter ego of Coffman Construction, which does not contest jurisdiction, and therefore Coffman Construction’s contacts with the District of Columbia may be attributed to Specialties. Specialties submits that the two companies are not alter egos; furthermore, Specialties raises equitable estop-pel and ethical objections in light of a previous matter in which plaintiff allegedly maintained that the companies were separate entities. The Court first finds that equitable estoppel and ethical considerations do not bar plaintiff from prevailing on an alter ego theory, and further finds that the two companies are alter egos.
 

 1. Ethical and equitable estoppel analyses
 

 Specialties contends that plaintiff is barred from prevailing on its alter ego theory because plaintiff previously took the opposite position when representing Specialties in a matter before the U.S. Department of Transportation (“USDOT”). On July 30, 1993, the California Department of Transportation (“Caltrans”) decer-tified Specialties as a Women-Owned Business Enterprise (WBE). Pending an appeal of the decision to the USDOT, Specialties’ WBE status was continued on an interim basis until November 1994. Due to concerns that the interim status would lapse before the USDOT rendered a decision, Specialties retained O’Riordan, an attorney with plaintiff, on October 3, 1994, to use its contacts at the USDOT and to act as local counsel. During her representation, O’Riordan primarily made phone calls and wrote three letters in October 1994. On December 8, 1994, the USDOT issued a letter remanding the decertification decision to CalTrans.
 

 Specialties makes two arguments as to why plaintiff should be barred from arguing that Coffman Construction and Specialties are alter egos. In its Pre-Hearing Statement, Specialties invokes the doctrine of equitable estoppel, such that a party is prevented by his own conduct from claiming a right to the detriment of another party. In its Post-Hearing Statement, Specialties contends that plaintiffs inconsistent positions violate its ethical obligations to Specialties, and therefore, plaintiff should not be permitted to benefit from unethical conduct.
 

 The Court finds neither argument persuasive. Equitable estoppel is not appropriate in this situation. Typically, as Specialties itself notes, equitable estoppel can prevent a party “from taking advantage of his inconsistent conduct to the detriment of another,” and “to prevent a party by virtue of his own conduct from claiming a right to the detriment of the other party, who was entitled to rely on such conduct and has acted accordingly.” Defs.’ Pre-Hearing Statement at 9. Such a situation does not exist here. Plaintiff represented to the USDOT that Specialties was a WBE because plaintiff was Specialties’ attorney and was advocating that position on Specialties’ behalf. Plaintiff
 
 *22
 
 did not derive any special benefit in making such a representation, nor did Specialties suffer any particular detrimental reliance. Moreover, plaintiff is not using its prior position to its advantage in the current attorney’s fee action.
 
 [5]
 
 . Therefore, the Court finds that plaintiff is not equitably estopped.
 

 Specialties’ ethical argument also is in-apposite to this situation. Specialties argues that plaintiff has violated Rule 1.9 of the District of Columbia Rules of Professional Conduct. Rule 1.9 states that
 
 “a
 
 lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person’s interests are materially adverse to the interests of the former client____” Specialties contends that plaintiff represented Colleen and Specialties in a matter involving substantially the same issues of independent ownership and control that are now in question in this matter.
 

 However, assuming Specialties’ characterization of the situation is correct, Rule 1.9 does not apply. Rule 1.9 contemplates a lawyer’s representing two separate clients in which the lawyer advocates positions that are materially adverse to each other. This suit involves plaintiffs attempt to recover attorney’s fees against a former client, and in such a situation, plaintiff may employ such information, as reasonably believed necessary, that may be adverse to the interests of the client, in order to resolve a fee dispute.
 
 See
 
 D.C.Rule of Professional Conduct 1.6(d); Rest.3d Law Governing Lawyers § 117, cmt. a (1989). Furthermore, the Scope section of the D.C.Rules of Professional Responsibility states that:
 

 nothing in the Rules or associated Comments or this Scope section is intended to confer rights on an adversary of a lawyer to enforce the Rules in a proceeding other than a disciplinary proceeding. A tribunal presented with claims that the conduct of a lawyer appearing before that tribunal requires, for example, disqualification of the lawyer and/or the lawyer’s firm may take such action as seems appropriate in the circumstances, which may or may not involve disqualification.
 

 The Court finds that plaintiffs conduct does not violate Rule 1.9. Insofar as plaintiffs conduct may violate other rules not cited by Specialties, the Court finds it unnecessary in this proceeding to assess the ethical implications of plaintiffs actions.
 

 2. Alter ego analysis
 

 Ordinarily, a defendant corporation’s contacts with a forum may not be attributed to shareholders, affiliated corporations, or other parties.
 
 See Rush,
 
 444 U.S. at 332, 100 S.Ct. 571;
 
 Wiggins v. Equifax, Inc.,
 
 853 F.Supp. 500, 503 (D.D.C.1994). An exception exists, however, where affiliated parties are alter egos of a corporation over which the Court has personal jurisdiction; in that ease the corporation’s contacts may be attributed to the affiliated party for jurisdictional purposes.
 
 See Minnesota Mining & Mfg. Co. v. Eco Chem., Inc.,
 
 757 F.2d 1256, 1265 (Fed.Cir.1985) (“[I]f the corporation is [the defendant’s] alter ego, its contacts are his and due process is satisfied.”) (internal quotation omitted);
 
 Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc.,
 
 1987 WL 11085, *4 (D.D.C. May 8, 1987);
 
 see also El-Fadl v. Central Bank of Jordan,
 
 75 F.3d 668, 676 (D.C.Cir.1996).
 

 Whether one corporation is the alter ego of another is a question of law to be decided by the court.
 
 Material Supply
 
 
 *23
 

 Int’l v. Sunmatch Indus. Co. Ltd.,
 
 1999 WL 680357 at *4 (D.D.C. June 29, 1999). This Circuit has established a two-prong test for determining whether the court should disregard the corporate veil. A plaintiff must show by affirmative evidence that two elements have been satisfied:
 

 (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and
 

 (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?
 

 Labadie Coal Co. v. Black,
 
 672 F.2d 92, 97 (D.C.Cir.1982).
 
 [6]
 

 See also I.A.M. Nat’l Pension Fund v. Wakefield Indus., Inc.,
 
 1991 WL 511071 (D.D.C.1991) (unpublished decision). Considerations of justice and equity justify piercing the corporate veil and finding the corporation’s officers or shareholders to be alter egos of the corporate entity when there is a unity of ownership and interest.
 
 Vuitch v. Furr,
 
 482 A.2d 811, 815-16 (D.C.1984). “Unity of interest and ownership can ... be demonstrated by showing domination and control of a corporation, as in a parent-subsidiary relationship or in a closely held corporation.”
 
 Id.
 
 Individuals or other entities may be held liable for the activities of a corporation when it is demonstrated that “the corporation is not only controlled by those persons [who are alleged alter egos of the corporation], but also that the separateness of the persons and the corporation has ceased and ... an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice.”
 
 Camacho v. 1440 Rhode Island Ave. Corp.,
 
 620 A.2d 242, 249 (D.C. 1993) (internal quotation omitted);
 
 see also Bingham v. Goldberg, Marchesano, Kohlman, Inc.,
 
 637 A.2d 81, 93 (D.C.1994);
 
 Vuitch,
 
 482 A.2d at 815.
 

 Relevant to the first question in the
 
 Labadie
 
 test is the degree to which separate corporate formalities have been followed. In assessing this issue, a court should consider the following factors:
 

 1) the nature of the corporate ownership and control;
 

 2) failure to maintain corporate minutes;
 

 3) substantial disregard of the formalities of the corporate form;
 

 4) commingling of funds and other assets of the corporation;
 

 5) diversion of the corporation’s funds and other assets to noncorporate uses such as the personal use of the corporations’s shareholders; and
 

 6) use of the same office or business location by the corporation and its individual shareholders.
 

 Labadie,
 
 672 F.2d at 97. “Because piercing the corporate veil is a doctrine of equity, the factor which predominates will vary in each case, and the decision to pierce will be influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of the corporation.”
 
 Vuitch,
 
 482 A.2d at 815-16;
 
 see Camacho,
 
 620 A.2d at 249. Although Specialties’ compliance with certain corporate formalities makes this case a close call, the Court finds in the record a disturbing number of instances in which these factors are present, such that the Court must conclude that Specialties and Coffman Construction are alter egos.
 
 [7]
 

 
 *24
 
 The Court believes the factor that predominates in this case is the unity of financial transactions. The manner in which funds flowed between the two corporations essentially amounted to a commingling of funds and diversion of Specialties’ funds for Coffman Construction’s use. The expert report by Certified Public Accountant Howard N. Kenyon, Jr. (“Kenyon Report”), who also testified at the evidentiary hearing, concludes that Specialties and Coffman Construction “operated as a single entity with respect to their financial transactions.” Kenyon Report at 10.
 
 [8]
 
 He states that “[t]he frequency, volume, and materiality of intercompany exchanges and commingling of assets, as shown by then-accounting records, clearly establishes that the two companies were essentially one economic entity regardless of their separate corporate identities.”
 
 Id.
 
 On at least 133 occasions between September 1994 and March 1996, Specialties advanced cash to Coffman Construction.
 
 See
 
 Kenyon Report at 13-14. The total amount advanced during that time frame was $656,493.99.
 
 See
 
 Kenyon Report at 13. While these transfers of cash were tracked in the books of both companies, Specialties acknowledges that there are no separate documents memorializing these cash advances, nor any interest charged, nor any collateral pledged. Essentially, these cash advances were oral, unsecured, interest-free loans. Other courts have found interest-free loans to be a relevant factor in piercing the corporate veil, particularly where the loans were not executed through written documents.
 
 I.A.M. Nat’l Pension Fund,
 
 1991 WL 511071 at *5;
 
 Northern Tankers,
 
 967 F.Supp. at 1405 (“These intercompany liabilities were not memorialized by promissory notes, and the interest on them was merely accrued, rather than regularly paid.”).
 

 Funds were diverted from Specialties to pay for some of Coffman Construction’s ordinary business expenses on a number of occasions. For example, from September 1994 through March 1996, Specialties paid out approximately $34,000 for over 100 transactions made by Coffman Construction, including payments to American Express, United Parcel, and rent for office space.
 
 See
 
 Kenyon Report at 12-13. Specialties acknowledges these transactions, but states that these advances were loaned pursuant to an oral agreement. Yet again, Specialties did not charge any interest nor require any collateral.
 

 Specialties also assisted Coffman Construction in making payments to plaintiff for legal fees. On two occasions, Specialties paid legal fees that Coffman Construction owed to plaintiff, wiring $7,500 on May 22, 1995, and $10,000 on August 7, 1995. Although Specialties claims that these transfers were made under pressure by plaintiff, it is notable that again, Specialties never executed any written documents or charged interest or required collateral. Furthermore, during late spring and summer 1995, Judah Lifschitz, an attorney with plaintiff, testified at the hearing that James promised to pay plaintiff for outstanding indebtedness as soon as Specialties (not Coffman Construction) was paid for its jobs.
 
 [9]
 

 
 *25
 
 In paying for both the ordinary business expenses and the legal fees, Specialties did not benefit in any obvious way. Coffman Construction essentially used Specialties as a source of money for its own corporate operations when it lacked sufficient funds, and the two companies did not maintain an arms-length relationship in their transactions. See
 
 Bufco Corp. v. N.L.R.B.,
 
 147 F.3d 964, 969 (D.C.Cir.1998) (upholding decision to pierce the corporate veil between two corporations,
 
 one
 
 owned by a husband, and one owned by the wife and son, in part because the corporations commingled funds and did not maintain arms-length relationships);
 
 Wm. Passalacqua Builders v. Resnick Developers South, Inc.
 
 933 F.2d 131, 140 (2d Cir.1991) (finding sufficient evidence of corporate domination to submit to jury where funds were shuffled between two corporations based on need).
 

 The manner in which Coffman Construction repaid debts to Specialties also indicates the lack of division between the corporations. First, Coffman Construction repaid a significant portion of its debts to Specialties by forwarding cash receivables due to Coffman Construction. Such cash receivables included payments from general contractors, worker’s compensation refunds, and some type of loans obtained by an unidentified third-party. Between September 1994 and March 1996, Specialties deposited $357,769 of Coffman Construction’s cash receivables directly into its bank account.
 
 See
 
 Kenyon Report at 13. Although Specialties argues that the net effect of such a “passthrough” is the same as if Coffman Construction had deposited the cash receivable and then issued a payment to Specialties, the Court finds the manner of payment more relevant than the net effect, as it goes to the integrity of the transaction.
 

 Second, Coffman Construction paid off its debt to Specialties by providing “con-suiting services,” which Colleen requested orally, without any written documentation or contracts defining the work Coffman Construction would perform or the rates that Coffman Construction would charge.
 
 [10]
 
 Coffman Construction did submit invoices to Specialties after the work was completed, but did not describe the work performed in any detail — the invoices consisted solely of the job name, hours worked, and amounts due. From September 1994 to March 1996, Coffman Construction charged Specialties at least $192,700 in these consulting fees.
 
 See
 
 Kenyon Report at 11-12. Between July and September 1996, Coffman Construction charged $218,-200 in consulting fees.
 
 See
 
 Kenyon Report at 12.
 

 The fact that Coffman Construction served as a consultant to Specialties on such a significant basis without any written request or definition of the work from Specialties also implicates another factor— the nature of corporate ownership and control. It is uncontested that there is no legal common ownership between Specialties and Coffman Construction; Colleen is Specialties’ sole shareholder, and James is Coffman Construction’s sole shareholder. (It is notable, however, that from January 1995 forward, Specialties recorded its “cash advances” to Coffman Construction in an account titled “Due From Stockholder,” even though Coffman Construction is not a formal stockholder.) However, the significant degree to which Coffman Construction was involved in Specialties’ projects as a “consultant” implies that Coff-man Construction exerted an unusual amount of control over Specialties’ operations: Specialties gave Coffman Construction responsibility for duties ranging from technical assistance on projects, bidding and estimating for jobs, scheduling performance on contracts awarded to Specialties, and negotiating on behalf of Specialties with others.
 

 
 *26
 
 Specialties and Coffman Construction appear also to have shared at least one of their employees. Specifically, Specialties’ payroll shows that it employed Cynthia Sargent, its sole employee, from 1991 to at least August 1997. Coffman Construction also employed Sargent until November 1993. However, even after Sargent was no longer on Coffman Construction’s payroll, she continued to assist Teresa Bogart, Coffman Construction’s bookkeeper, in keeping the books and assisting Coffman Construction’s attorneys with litigation by providing clerical and logistical assistance. She even prepared and signed internal payment authorization forms on behalf of Coffman Construction.
 
 [11]
 

 Moving to the second prong of the
 
 Laba-die
 
 test, the Court considers whether there would be some element of injustice or fundamental unfairness if the Court were to find that Specialties and Coffman Construction are not alter egos.
 
 See Labadie,
 
 672 F.2d at 99. A finding of unfairness does not require fraud, or willfully wrongful conduct.
 
 Id.
 
 at 100. “The essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of carefree entrepre-neuring by doing so through a corporate shell.”
 
 Id.
 
 The Court should consider the entire picture of the relationship between the two corporations, including the many factors listed in the formalities prong of the test.
 
 Id.
 
 One prime example of unfairness is the failure adequately to capitalize the corporation. Id. at 99.
 

 Applying this test, the Court finds that a failure to pierce the corporate veil would create an injustice on plaintiff. Plaintiff has demonstrated, beyond a preponderance of the evidence, that the two corporations frequently deal with each other in a manner that breaches the normal corporate formalities, particularly with respect to their financial transactions. When Coff-man Construction fell behind on payments to plaintiff, Lifschitz testified at the hearing that James stated he would pay plaintiff as soon as Specialties was paid. It is apparent from the record evidence that during the time period that plaintiff maintained a relationship with Specialties and Coffman Construction, Coffman Construction used Specialties as its own source of funds when it lacked sufficient funds. Specialties cannot now claim to shield its funds from plaintiffs reach. The Court therefore finds it appropriate to pierce the corporate veil between these two corporations.
 

 Conclusion
 

 For all the foregoing reasons, the Court grants plaintiffs motion to strike the affidavit of Carol O’Riordan and its motion to supplement the evidentiary record, and denies defendants’ request to supplement the evidentiary record with documents produced by defendants on February 12,1999. Furthermore, the Court grants the motion to dismiss for lack of personal jurisdiction as to Colleen Coffman, but denies it as to
 
 *27
 
 Coffman Specialties, Inc., on the basis that it is an alter ego of Coffman Construction, Inc. An appropriate Order accompanies this Opinion.
 

 ORDER
 

 For the reasons stated in the accompanying Opinion, it hereby is
 

 ORDERED, that the motion to dismiss filed by defendants Colleen Coffman and Coffman Specialties, Inc., is granted as to Colleen Coffman, but denied as to Coffman Specialties, Inc. It hereby further is
 

 ORDERED, that plaintiff’s motion to strike the affidavit of Carol O’Riordan from defendants’ Post-Hearing Statement is granted. It hereby further is
 

 ORDERED, that plaintiffs motion to supplement the evidentiary record with the documents attached to plaintiffs motion is granted. It hereby further is
 

 ORDERED, that defendants’ request to supplement the evidentiary record with the documents attached to defendants’ opposition to plaintiffs motion to supplement the evidentiary record is denied.
 

 SO ORDERED.
 

 [1]
 

 . A discussion of (he procedural history of this case is not necessary for this Opinion. Furthermore, such a discussion is adequately set forth in the Court's September 30, 1998, Opinion.
 

 [2]
 

 . This Opinion does not address other motions subsequently filed in this case, as they are not relevant (o the personal jurisdiction issue: plaintiff’s motion for summary judgment on all the counterclaims, defendants’ three motions to modify
 
 nunc pro tunc
 
 the Scheduling Order and to oppose plaintiff's motion for summary judgment on the counterclaims, and plaintiff's motion for partial summary judgment on the breach of contract claim.
 

 [3]
 

 . If the Court were to rely on the parties’ arguments, the Court would also find reason to strike the affidavit. If, as plaintiff claims, the affidavit contains new information or hearsay evidence regai'ding alleged statements by Colleen, then the affidavit is impermissible; furthermore, it is an unfair attempt to present new evidence without cross-examination. (The affidavit does not qualify under the party admission exception in Fed.R.Evid. 801(d)(2)(D) because O’Riordan is a former employee.
 
 E.g., Robertson
 
 v.
 
 National Railroad Passenger Corp.,
 
 1999 WL 280407 at *1 (E.D.La. May 3, 1999).) If, as Colleen and Specialties claim, the affidavit contains the same information as presented at the hearing, then there is no need for the affidavit, as the information is not newly discovered or previously unavailable.
 
 See Chrysler Corp. v. Uptown Motorcars-Hartford,
 
 1999 WL 196558, *1 (6th Cir.1999) (unpublished decision).
 

 [4]
 

 . Colleen and Specialties call their request a "motion.” Plaintiff argues that it should be denied as procedurally irregular because defendants failed to comply with Local Civil Rule 7.1(a), (c), and (m) (formerly Local Rules 108(a), (c), and (m)). The Court finds that while Colleen and Specialties did attach a proposed order in compliance with LCvR 7.1(c), they did not confer with opposing counsel under LCvR 7.1(m), nor did they provide points of law and authority that support their "motion” as required under LCvR 7.1(a). The Court also finds, however, that plaintiff will not be prejudiced by this noncompliance but cautions defendants to observe procedural regularities in the future.
 

 [5]
 

 . The Court could also interpret Specialties’ equitable estoppel argument as a bar from taking inconsistent positions in two different proceedings. Again, Specialties does not prevail. The caselaw is clear that the party seeking to invoke equitable estoppel must have been an adverse party in the prior proceeding.
 
 See Konstantinidis v. Chen,
 
 626 F.2d 933, 937 (D.C.Cir.1980). In the USDOT proceeding, plaintiff was not an adverse party to Specialties, but was Specialties’ lawyer.
 

 [6]
 

 . Although this test generally is used to reach an individual behind a corporation, this same test has been applied to pierce the corporate veil between two corporations, such as between parent-subsidiary corporations.
 
 See Material Supply Int’l,
 
 1999 WL 680357 at *5. The Court sees no reason not to apply this test to the situation presented here.
 
 Cf. Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,
 
 85 F.3d 201, 208 n. 3 (5th Cir.1996) (applying factors for piercing corporate veil between parent and subsidiary corporations to two corporations, noting also that the factors have been applied to piercing the corporate veil between an individual and a corporation).
 

 [7]
 

 . Even if the Court were to have admitted defendants' untimely documents produced after February 12, 1999, which included docu
 
 *24
 
 mentation of Coffman Construction’s annual corporate meetings of shareholders from March 1994 to March 1998, this evidence would not have tipped the balance against finding the corporations to be alter egos.
 
 See Bufco Corp. v. N.L.R.B.,
 
 147 F.3d 964, 969 (D.C.Cir.1998) (finding two corporations to be alter egos despite the allegation that defendants conducted and recorded all corporate meetings).
 

 [8]
 

 . Although Specialties alleged that Kenyon’s conclusions should be disregarded as biased because of his accountant work for Coffman Construction in an unrelated matter, the Court denied defendants’ motion to disqualify plaintiff's expert at the evidentiary hearing, finding no accountant-client privilege in the District of Columbia.
 

 [9]
 

 . Although Specialties objects to Lifschitz’s testimony of James's representations as hearsay, the Court notes that James’s statements are non-hearsay admissions by a party-opponent under Fed.R.Evid. 801(d)(2).
 

 [10]
 

 . These consulting services were provided primarily by James and sometimes by Coff-man Construction employee Billy Chang, who provided some estimating and technical assistance.
 

 [11]
 

 . Whether the office space is shared by the two corporations is a subject of sharp debate between the parties. It is undisputed that Specialties and Coffman Construction occupied adjoining offices, which had separate entrances. According to Judah Lifschitz’s testimony at the evidentiary hearing, however, once inside the offices, there was no physical barrier or door between Specialties’ and Construction’s office spaces, and people could walk without obstruction between their two office spaces. Specialties maintains exactly the opposite: that an access door existed between the offices, which generally was closed but was kept open for plaintiff's convenience while its attorneys were working in the offices.
 

 Lifschitz also testified that Specialties and Coffman Construction shared office equipment. For example, while Specialties and Coffman Construction had their own phone lines, he indicated that when he would call either of the companies, the two corporations' employees would answer the phone for each other. Specialties, on the other hand, maintains that each company used its own copier, fax, computers, and phones and cites the deposition of Teresa Bogart, who worked for Coffman Construction for 15 years, and then for Specialties from about January 1997 to October 1997.